In the
United States Court of Appeals
For the Seventh Circuit

No. 98-2386

ANN M. HOSTETLER,

Plaintiff-Appellant,

v.

QUALITY DINING, INC.,

Defendant-Appellee.


Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 97 C 160--Robin D. Pierce, Magistrate Judge.


Argued January 7, 1999--Decided June 29, 2000


  Before FLAUM, EASTERBROOK, and ROVNER, Circuit
Judges.

  ROVNER, Circuit Judge.  Ann Hostetler alleges
that a fellow supervisory employee at a South
Bend, Indiana Burger King grabbed her face one
day at work and stuck his tongue down her throat.
On the following day, he tried to kiss her again
and when she struggled to evade him, he began to
unfasten her brassiere, threatening to "undo it
all the way." When Hostetler reported these
incidents to her superiors, her district manager
allegedly remarked that he dealt with his
problems by getting rid of them. Days later,
Hostetler was transferred to a distant Burger
King location. She later filed this sex
discrimination suit against her employer under
Title VII of the Civil Rights Act of 1964, 42
U.S.C. sec. 2000e-2(a)(1), contending that she
had endured a hostile working environment as a
result of the alleged harassment. See Meritor
Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66, 106 S.
Ct. 2399, 2405 (1986). The district court granted
summary judgment to the defendant, reasoning that
the harassment Hostetler describes was not
severe, see id. at 67, 106 S. Ct. at 2405; Saxton
v. American Tel. & Tel. Co., 10 F.3d 526, 533 (7th
Cir. 1993), and that, in any event, her employer
absolved itself of liability by responding to her
complaint with steps reasonably designed to
preclude further harassment, see, e.g.,
Adusumilli v. City of Chicago, 164 F.3d 353, 361

(7th Cir. 1998), cert. denied, 120 S. Ct. 450 (1999). Hostetler v. Quality Dining, Inc., 1998 WL 456436 (N.D. Ind. April 23). Although a finder of fact might reach the same conclusions after a trial, we do not believe it appropriate to hold, as a matter of law, that the alleged harassment was not severe or that her employer's response was non-negligent. We therefore reverse the grant of summary judgment.

I.

The facts that follow represent a reading of the record that is favorable to Hostetler. We have noted some of the factual matters that are in dispute, but as this case was resolved against Hostetler on summary judgment, we are of course obligated to credit her version of events over the defendant's. E.g., Valance v. Wisel, 110 F.3d 1269, 1276 (7th Cir. 1997).

Quality Dining, Inc. ("Quality"), through its subsidiary Bravokilo, Inc., owns some twenty-four Burger King restaurants in Northern Indiana. Hostetler began work for Quality in 1993 as a managerial employee. As a supervisor, Hostetler was subject to transfer on an as needed basis among the various restaurants that Quality owned, and over the next several years, she worked at a number of different Burger King stores in South Bend and Mishawaka, Indiana.

In June of 1996, Hostetler was working as a first assistant supervisor at the Burger King on Ireland Road in South Bend. As a first assistant, Hostetler reported to both the store and district managers. Kim Ridenour was the store manager at that time. Jim Kochan was the district manager, and in that capacity looked after all of the stores in South Bend and Mishawaka.

Hostetler asserts that she was at work on June 3, using the computer in the restaurant's cash booth, when Tim Payton, a second assistant supervisor, grabbed her face and "stuck his tongue down [her] throat." Hostetler Dep. 44. She pulled away from him, gathered her belongings, and left the store at once, although her shift was not yet complete. She made no report of the incident to Ridenour at that time.

On the following day, Hostetler was again doing some work on the computer in the restaurant's office. Her back was to the office door, and as she was preoccupied with the task at hand, she did not turn when Payton entered the room. He came up from behind her, took her face in his hands, and turned it toward him. Thinking that he was about to kiss her again, Hostetler bent over and placed her head between her knees. Payton

then placed his hands on her back, grasped her brassiere, and began to unfasten it. Hostetler told him to take his hands off her, which prompted him to laugh and say that "he would undo it all the way." Hostetler Dep. 48. Payton managed to unfasten four of the five snaps on Hostetler's bra before Sabrina Ludwig, another store employee, walked into the office. Payton left the area abruptly.

One other episode requires mention. Either before the incident of June 3 or after the incident of June 4--but either way during the same week as these two incidents--Payton approached Hostetler as she was serving customers at the counter and told her, in crude terms, that he could perform oral sex on her so effectively that "[she] would do cartwheels." Hostetler Dep. 49.

After the June 4 incident, Hostetler decided to report the harassment to her superiors. The ensuing chronology is in some dispute. Hostetler, Ridenour, and Kochan have all given accounts that differ in certain respects. Again, as this case comes to us on summary judgment, we of course are compelled to credit Hostetler's recitation of events.

Hostetler telephoned Ridenour on June 4 and reported the harassment. Hostetler told Ridenour that she "didn't think [Payton] needed to be fired, he just needed to be talked to." Hostetler Dep. 62. Ridenour said that she would bring the matter to Kochan's attention the next day when she met with him. Hostetler saw Ridenour the following day and asked how the discussion had gone, but Ridenour said that she had forgotten to mention the harassment. Ridenour again promised to speak with Kochan, but when Hostetler followed up with her late in the day on June 6, she had still not done so. At that point, Hostetler opted to leave Kochan a voice message. In that message, which Quality later transcribed, Hostetler detailed the harassment that had occurred on June 3 and 4 and requested Kochan to "take care of it."/1

Kochan was on vacation from June 6 through June 9,/2 but he met with Hostetler and Ridenour regarding the reported harassment on June 10. As Hostetler recounts the meeting, Kochan accused her of lying and noted that Payton had denied her allegations. Kochan asked Hostetler, "Do you know what I do when I have problems, Ann?" When Hostetler said she did not, Kochan told her, "I get rid of them." Hostetler Dep. 67. Hostetler took Kochan to mean that he might transfer her, and she pleaded with him not to do so; Kochan said he would think about it. Then, after noting

that he had a copy of Hostetler's voice message, Kochan asked Ridenour whether she had any problems with Hostetler's work performance. Ridenour expressed concern over the fact that Hostetler had left work early on June 3 (after Payton had kissed her)./3

On June 12, Quality transferred Hostetler to a Burger King in Goshen, Indiana. According to Kochan, the district manager for the Goshen area, T. K. Brenneman, had asked him whether he could spare an employee for a store in his district that was managerially short-staffed. Kochan avers that he thought of Hostetler, because the Ireland Road store was "heavy" with supervisory employees and because he knew that Hostetler and Ridenour had a personality conflict. Kochan Dep. 34, 36. Brenneman had also worked with Hostetler before and purportedly was pleased at the prospect of having her join his staff. Such transfers are commonplace at Quality, and Kochan asserts that the move was not intended to punish her. Hostetler suspected otherwise, in light of Kochan's prior remark about getting rid of his problems./4

The transfer to Goshen proved to be a hardship for Hostetler. The commute to and from the Goshen store consumed two and one-half hours of Hostetler's day. At the outset, Hostetler was assigned to close the store nearly every evening, which meant that she worked until 4:00 a.m. This made it difficult for Hostetler, once she returned home, to rise with her daughters in the morning. She would also be assigned to work fourteen to sixteen-hour days and then be scheduled to return to the store after only six hours off.

Meanwhile, Hostetler's transfer left the Ireland Road Burger King in South Bend with no first assistant supervisors. None of the second assistants was qualified for promotion to first assistant, so Hostetler's position was left unfilled. This posed no problem for the store, Ridenour testified, because second assistants could perform nearly all functions that first assistants could. One exception was that only a first assistant could manage a store without supervision from the store manager. Thus, to the extent that Ridenour permitted second assistants to run the store in her absence, she may have done so in violation of Quality's rules.

After six weeks at the Goshen store, Hostetler asked for another assignment. Hostetler spoke with Jerry Fitzpatrick, Kochan's superior, and complained that the company had sent her to Goshen as punishment for complaining about Payton. Fitzpatrick denied her assertion:

I don't care what happened between you and Mr. Payton. What happened between you and Mr. Payton, happened between you and Mr. Payton. All I care about is resolving our business relationship so that you can be happy and I can be happy and my business can be productive.

Hostetler Dep. 84-85./5 Fitzpatrick also emphasized that Hostetler was a valued employee:

[Y]ou didn't get transferred because of anything that you did wrong, Ann. You got transferred because we need a good player. You're one of our best players. You've got a future with our company.

Hostetler Dep. 84. "Bologna," Hostetler retorted. Id. "You don't send your best player off to another team." Id. Fitzpatrick predicted that she would "get the point" the following week, informing her that she would be transferred to the Lincoln Way East store in Mishawaka and promoted to store manager. Id. at 85.

Notwithstanding her reassignment and promotion, Hostetler decided to leave the company. She resigned in August 1996 and subsequently went to work for a competing fast food chain. She has sought counseling for the trauma that she attributes to the alleged harassment that gave rise to this suit, and at the time of her deposition was taking Prozac "because [her] nerves [were] a wreck." Hostetler Dep. 92.

After reviewing the record, the district court concluded that Quality was entitled to summary judgment on either of two grounds. The court noted that a hostile environment claim requires proof of harassment sufficiently severe or pervasive to alter the plaintiff's working environment. Hostetler v. Quality Dining, Inc., 1998 WL 456436, at *8, quoting Meritor Sav. Bank, FSB v. Vinson, supra, 477 U.S. at 67, 106 S. Ct. at 2405. The small number of acts alleged, taking place as they did over a matter of days, ruled out any argument that the harassment was pervasive. 1998 WL 456436, at *11; see Saxton v. American Tel. & Tel. Co., supra, 10 F.3d at 533 ("'relatively isolated' instances of non-severe misconduct will not support a hostile environment claim"), quoting Weiss v. Coca-Cola Bottling Co. of Chicago, 990 F.2d 333, 337 (7th Cir. 1993).

In the district court's view, the harassment of which Hostetler complained could not be described as severe. 1998 WL 456436, at *11. In previous cases, we had deemed certain manifestations of physical harassment--including attempts to kiss a co-worker, touching her on the shoulder or

thigh, and jumping out of bushes and attempting to grab the plaintiff--not to be severe. See Weiss, 990 F.2d at 337; Saxton, 10 F.3d at 533-34. The district court viewed the acts described by Hostetler as comparable. 1998 WL 456436, at *10. The court also cited Hostetler's own testimony as evidence that the conduct in question fell into the category of merely vulgar and inappropriate behavior rather than actionable harassment. Id. at *11. In describing the voice mail she had left Kochan, Hostetler had testified:

I told him--I kind of chuckled and said, "We all know that I'm gifted on top. I don't have one or two snaps on my bra." I said, "I don't think that he should be fired, but you definitely need to speak to him, because we wouldn't want somebody's father or mother coming in here and killing this man because he's messed with their kid."

Hostetler Dep. 65. In the court's view, "[Hostetler's] own comments speak more to the inappropriateness of Mr. Payton's remarks and actions, rather than to a severe, hostile, or intimidating environment." 1998 WL 456436, at *11.

Alternatively, assuming that Payton's actions were severe enough to constitute actionable harassment, Quality could not be held liable for those actions because, once notified of the harassment, it "responded promptly and took reasonable steps to resolve the problem." Id. at *12, citing Baskerville v. Culligan Int'l Co., 50 F.3d 428, 431 (7th Cir. 1995). The court noted first that Kochan was the individual responsible for handling personnel problems, and as soon as he had received Hostetler's voice message, he had scheduled meetings with the persons involved for the morning of his return to work from vacation. 1998 WL 456436, at *13. Second, although Hostetler suggested that Quality had not disciplined Payton appropriately, the court noted that she herself had said he should not be fired, but rather "talked to," and talked to he was. Id. Finally, the court rejected Hostetler's contention that her transfer to Goshen was a negligent response to the harassment. Kochan's deposition testimony established that the company transferred Hostetler at least in part in order to accommodate the need for additional managerial employees at the Goshen restaurant and to resolve a personality conflict between Hostetler and Ridenour. Id.; see n.7, infra. Although the transfer imposed some hardships on Hostetler, "it also served a legitimate business purpose while separating her from the accused harasser." 1998 WL 456436, at *14.

II.

"Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Shermer v. Illinois Dep't of Transp., 171 F.3d 475, 477 (7th Cir. 1999). We review the district court's summary judgment ruling de novo, construing the record in the light most favorable to the non-movant, Hostetler. E.g., Dawn Equip. Co. v. Micro Trak Sys., Inc., 186 F.3d 981, 986 (7th Cir. 1999). So long as no reasonable finder of fact could find for Hostetler, summary judgment is mandatory. Fed. R. Civ. P. 56(c); Matney v. County of Kenosha, 86 F.3d 692, 695 (7th Cir. 1996). If, however, the record leaves room for a finding in Hostetler's favor, then we must reverse the grant of summary judgment and remand for a trial. See Bultemeyer v. Fort Wayne Community Schools, 100 F.3d 1281, 1283 (7th Cir. 1996), citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S. Ct. 2505, 2511 (1986).

A.

As the district court recognized, sexual harassment is actionable under Title VII only when it is "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" Meritor Sav. Bank, 477 U.S. at 67, 106 S. Ct. at 2405, quoting Henson v. City of Dundee, 682 F.2d 897, 904 (11th Cir. 1982). Whether the harassment rises to this level turns on a constellation of factors that include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S. Ct. 367, 371 (1993); see also Faragher v. City of Boca Raton, 524 U.S. 775, 787-88, 118 S. Ct. 2275, 2283 (1998). We also assess the impact of the harassment upon the plaintiff's work environment both objectively and subjectively. The work environment cannot be described as "hostile" for purposes of Title VII unless a reasonable person would find it offensive and the plaintiff actually perceived it as such. Faragher, 118 S. Ct. at 2283, citing Harris, 510 U.S. at 21-22, 114 S. Ct. 370-71.

We may make short work of the subjective inquiry, for the record readily supports the inference that Hostetler perceived her work environment as hostile as a result of the harassment. She left work abruptly after the June 3rd incident, when Payton kissed (or tongued) her. The following day, when Payton approached Hostetler from behind, grasped her face, and

turned it toward him, she immediately bent over and placed her head between her knees in an effort to avoid a second "kiss." Promptly after that encounter, she reported Payton's conduct to Ridenour. Moreover, after she perceived that Ridenour was not pursuing the matter in a timely matter with Kochan, Hostetler left a voice message for him herself, reiterating that she found Payton's behavior "unacceptable" and asking Kochan to "take care of it." See n. 1, supra. These actions bespeak concern over Payton's actions and an unwillingness to tolerate further harassment.

Whether Hostetler's work environment objectively could be described as hostile is a somewhat closer question. The Supreme Court has reminded us that "the objective severity of the harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81, 118 S. Ct. 998, 1003 (1998), quoting Harris, 510 U.S. at 23, 114 S. Ct. at 371. That assessment also must be made with "an appropriate sensitivity to social context," 523 U.S. at 82, 118 S. Ct. at 1003, lest Title VII become a "general civility code for the American workplace," id. 80, 118 S. Ct. at 1002. As we observed in Baskerville:

Drawing the line is not always easy. On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. Meritor Savings Bank v. Vinson, 477 U.S. 57, 67, 106 S. Ct. 2399, 2405-06, 91 L.Ed.2d 49 (1986); Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 370, 126 L.Ed.2d 295 (1993); Carr v. Allison Gas Turbine Division, 32 F.3d 1007, 1009-10 (7th Cir. 1994). On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers. Meritor Savings Bank v. Vinson, supra, 477 U.S. at 61, 106 S. Ct. at 2402-03; Rabidue v. Osceola Refining Co., 805 F.2d 611, 620-21 (6th Cir. 1986); Katz v. Dole, 709 F.2d 251, 256 (4th Cir. 1983). We spoke in Carr of "the line that separates the merely vulgar and mildly offensive from the deeply offensive and sexually harassing." 32 F.3d at 1010. It is not a bright line, obviously, this line between a merely unpleasant working environment on the one hand and a hostile or deeply repugnant one on the other . . . .

50 F.3d at 430-31.

We have no doubt that the type of conduct at issue here falls on the actionable side of the line dividing abusive conduct from behavior that is merely vulgar or mildly offensive. Two of the three acts at issue in this case involved unwelcome, forcible physical contact of a rather intimate nature. Having a co-worker insert his tongue into one's mouth without invitation and having one's brassiere nearly removed is not conduct that would be anticipated in the workplace, and certainly not in a family restaurant. A reasonable person in Hostetler's position might well experience that type of behavior as humiliating, and quite possibly threatening. See Harris, 510 U.S. at 23, 114 S. Ct. at 371. Even the lewd remark that Payton allegedly made to Hostetler was more than a casual obscenity. Referring as it did to a hypothetical sexual act between Hostetler and Payton, it readily could be interpreted as an (uninvited) sexual proposition. These were not, in sum, petty vulgarities with the potential to annoy but not to objectively transform the workplace to a degree that implicates Title VII. A workplace rife with the behavior Hostetler describes could readily be described as a hostile working environment. See generally Harris, 510 U.S. at 21-22, 114 S. Ct. at 370-71.

The more specific, and more difficult, question that we must answer is whether the behavior was so serious that the finder of fact could label Hostetler's work environment hostile notwithstanding the limited number of the acts involved. Harassment need not be severe and pervasive to impose liability; one or the other will do. Smith v. Sheahan, 189 F.3d 529, 533 (7th Cir. 1999); see Harris, 510 U.S. at 21, 114 S. Ct. at 370; Meritor, 477 U.S. at 66, 106 S. Ct. at 2405. There is no "magic number" of incidents required to establish a hostile environment. Doe v. R.R. Donnelley & Sons Co., 42 F.3d 439, 445 (7th Cir. 1994), citing Rodgers v. Western-Southern Life Ins. Co., 12 F.3d 668, 674 (7th Cir. 1993). We have repeatedly recognized that even one act of harassment will suffice if it is egregious. See Smith, 189 F.3d at 533-34; DiCenso v. Cisneros, 96 F.3d 1004, 1009 (7th Cir. 1996); Daniels v. Essex Group, Inc., 937 F.2d 1264, 1273-74 & n.4 (7th Cir. 1991); King v. Board of Regents of Univ. of Wis. Sys., 898 F.2d 533, 537 (7th Cir. 1990); Bohen v. City of East Chicago, Indiana, 799 F.2d 1180, 1186-87 (7th Cir. 1986); see also Guess v. Bethlehem Steel Corp., 913 F.2d 463, 464 (7th Cir. 1990) (implicitly assuming single act sufficient to establish hostile environment).

The two principal acts at issue in this case were physical, rather than verbal harassment.

Physical harassment lies along a continuum just as verbal harassment does. There are some forms of physical contact which, although unwelcome and uncomfortable for the person touched, are relatively minor. Cumulatively or in conjunction with other harassment, such acts might become sufficiently pervasive to support a hostile environment claim, but if few and far between they typically will not be severe enough to be actionable in and of themselves. A hand on the shoulder, a brief hug, or a peck on the cheek lie at this end of the spectrum. Even more intimate or more crude physical acts--a hand on the thigh, a kiss on the lips, a pinch of the buttocks--may be considered insufficiently abusive to be described as "severe" when they occur in isolation. See Adusumilli v. City of Chicago, supra, 164 F.3d at 361-62; Koelsch v. Beltone Elecs. Corp., 46 F.3d 705, 706-07, 708 (7th Cir. 1995); Saxton, 10 F.3d at 528, 534; Weiss, 990 F.2d at 337; Scott v. Sears, Roebuck & Co., 798 F.2d 210, 211-12, 213-14 (7th Cir. 1986). But the acts described in these cases lie at the outer boundaries of conduct that can be labeled non-severe at the summary judgment stage. When the harassment moves beyond the sort of casual contact which (if it were consensual) might be expected between friendly co-workers, and manifests in more intimate, intrusive forms of contact, it becomes increasingly difficult to write the conduct off as a pedestrian annoyance. Recall that the types of physical acts we are discussing in this case already place us within the realm of conduct that unquestionably is harassing. See Baskerville, 50 F.3d at 430-31. The sole question is whether these acts are severe enough, without the added weight of repetition over time or cumulation with other acts of harassment, to stand alone as the basis for a harassment claim. Holding such acts not to be severe as a matter of law is another way of saying that no reasonable person could think them serious enough to alter the plaintiff's work environment. See Harris, 510 U.S. at 21-22; 114 S. Ct. at 370; Bermudez v. TRC Holdings, Inc., 138 F.3d 1176, 1181 (7th Cir. 1998). That proposition becomes dubious when the conduct at issue involves unwelcome contact with the intimate parts of one's body. Cf. DiCenso, 96 F.3d at 1009 (noting that harasser "did not touch an intimate body part").

The physical, intimate, and forcible character of the acts at issue here persuades us that a factfinder could deem Hostetler's work environment hostile. Accepting Hostetler's version of events as true, her co-worker did not simply steal a quick kiss from her lips, but, holding her face in his hands, forced his tongue into her mouth. When Hostetler subsequently used

her body to shield herself from an apparent repeat of that intrusion, Payton began to unfasten her bra, threatening to do so completely and stopping only when another employee entered the office. These acts exceed the kind of fumbled and inappropriate attempts to kiss or embrace the plaintiff that we dealt with in Saxton, Weiss, and like cases. A factfinder reasonably could interpret the alleged course of conduct as sufficiently invasive, humiliating, and threatening to poison Hostetler's working environment--indeed, overtones of an attempted sexual assault can be seen in the second incident in particular.

That Hostetler herself was of the view that Payton should not be fired, but spoken to--a fact on which the district court and Quality have placed some emphasis, 1998 WL 456436, at *11; Quality Br. at 21-22--does not speak to the objective severity of the harassment. Even as evidence of Hostetler's own thoughts, it bears on the manner in which Payton was to be disciplined rather than the gravity of the harassment. It certainly does not detract from the proposition that Hostetler subjectively found the harassment abusive and wanted it stopped, or that a reasonable person would feel the same. The remark reflects nothing more than Hostetler's subjective perception that talking to Payton would suffice to achieve that end./6

B.

As this is a case of co-worker harassment, Quality/7 will not be liable for the hostile environment absent proof that it failed to take appropriate remedial measures once apprised of the harassment. Adusumilli v. City of Chicago, supra, 164 F.3d at 361, citing Baskerville v. Culligan Int'l Co., supra, 50 F.3d at 43 132; Doe v. R.R. Donnelley & Sons Co., supra, 42 F.3d at 446; Guess, 913 F.2d at 465; 29 C.F.R. sec. 1604.1 l(d). Hostetler contends that the company's response was negligent in two respects: first, Ridenour and Kochan waited until June 10, six days after she first reported the harassment, to address her complaint; and second, the company resolved the situation in part by transferring Hostetler to a highly inconvenient location.

We need not consider whether a six-day delay in responding to Hostetler's complaint might be negligent. An employer is no doubt obligated to act with dispatch when it is informed that an employee is effectively assaulting his co-workers. See Baskerville, 50 F.3d at 432. But in this case there is no evidence that Hostetler was in any way injured by Quality's failure to act more quickly. There is, for example, no proof to

the effect that the harassment continued after June 4, when Hostetler first reported the harassment to Ridenour. It is possible that Hostetler was verbally harassed in the interim between June 4 and June 10. We know from Hostetler's testimony that either before the June 3rd incident or after the June 4th incident, Payton purportedly made the lewd remark to Hostetler as she was waiting on customers. Yet, given Hostetler's inability to recall the timing of that remark more precisely, there is no proof that the remark, or any other harassment, post-dated her complaint to Ridenour. See Avery v. Mapco Gas Prods., Inc., 18 F.3d 448, 453-54 (7th Cir. 1994). Indeed, the record does not even tell us whether Hostetler and Payton worked any shifts together between June 4 and June 10. Cf. Adusumilli, 164 F.3d at 362 (in some cases, mere presence of harasser can create hostile work environment). Under these circumstances, there would be no point in us determining whether the circumstances obligated Quality to act more quickly than Hostetler asserts that it did.

The factfinder could determine that when Quality did act, one of the steps it took in response to the harassment allegations was to transfer Hostetler to another location. That point is disputed./8 As we have noted, Kochan avers that he made the transfer decision when Brenneman, the manager of the Goshen district, told him that he needed an additional supervisor to cope with a shortage at the Goshen restaurant. Hostetler seemed like the logical choice to Kochan because the Ireland Road store where Hostetler worked had a surplus of managers, there was a personality conflict between Hostetler and Ridenour, and Brenneman knew and liked Hostetler. Nonetheless, a factfinder might infer from Kochan's purported remark to Hostetler two days earlier that he deals with his problems by getting rid of them that Kochan was predisposed to transfer Hostetler out of his district in order to resolve her complaint. The factfinder might also find it noteworthy that Kochan chose to transfer Hostetler notwithstanding the fact that her departure from the Ireland Road store in South Bend apparently left no one at that location who could, consistent with company policy, manage the store in Ridenour's absence. We shall therefore assume for the remainder of our discussion that Quality did, in fact, transfer Hostetler to Goshen in whole or in part as a means of addressing her charge of harassment. The factfinder might determine otherwise, of course. In that event, there would be no need to consider the propriety of the transfer as a remedial measure. But as this is summary judgment, we shall proceed on the assumption that the transfer was made to resolve the situation between

Hostetler and Payton.

Hostetler is not asserting that the transfer failed to stop the harassment./9 So far as the record reveals, once Hostetler was transferred, she never had any contact with Payton again. Nonetheless, she argues that the transfer was inappropriate as a remedial measure because it left her worse off than she was before the harassment occurred.

The cases recognize that there are some actions an employer might take in response to a worker's complaint of harassment that will, irrespective of their success in bringing the harassment to a halt, subject the employer to liability:

A remedial measure that makes the victim of sexual harassment worse off is ineffective per se. A transfer that reduces the victim's wage or other remuneration, increases the disamenities of work, or impairs her prospects for promotion makes the victim worse off. Therefore such a transfer is an inadequate discharge of the employer's duty of correction.

Guess v. Bethlehem Steel Corp., supra, 913 F.2d at 465; see also Steiner v. Showboat Op. Co., 25 F.3d 1459, 1464 (9th Cir. 1994), cert. denied, 513 U.S. 1082, 115 S. Ct. 733 (1995); Ellison v. Brady, 924 F.2d 872, 882 (9th Cir. 1991).

Negligence of this nature exposes the employer not to liability for what occurred before the employer was put on notice of the harassment, but for the harm that the employer inflicted on the plaintiff as a result of its inappropriate response. Recall that in the usual case of co-worker harassment, the employer becomes liable to the employee only when it knows or should know that wrongdoing is afoot and yet fails to take steps reasonably designed to stop it. See Guess, 913 F.2d at 465. In that scenario, the employer (provided it exercised due care in hiring the harasser) typically is held to account only for injuries that occur after the point at which it is on notice of the harassment--in other words, injuries that the employer could have prevented but did not. Where, however, the employer takes action that puts a stop to the harassment, but in a way that inappropriately forces the plaintiff to bear the costs, it is the plaintiff's loss in pay, her demotion, or the other "disamenities of work" for which she is entitled to compensation.

Here, then, Quality does not face liability for the harm that Payton allegedly inflicted on Hostetler. So far as the record reveals, Quality had no reason to know that Payton was mistreating anyone until Hostetler reported the harassment to

Ridenour. Moreover, as we have noted, there is no proof that the harassment persisted after Hostetler put Quality on notice of Payton's alleged misconduct. Supra at 17-18. The transfer to Goshen appears to have terminated all contact between Hostetler and Payton and thus foreclosed any opportunity for the harassment to recur. The company's asserted liability instead springs from the transfer itself. If, as Hostetler argues, Quality transferred her as a means of resolving the harassment, and if the transfer was a per se negligent response as discussed in Guess, then Quality could be held liable for the harm that the transfer caused her.

Based on the record before us, the factfinder could conclude that the transfer to Goshen left Hostetler materially worse off, and that the decision to transfer her was therefore a negligent response to the alleged harassment. Hostetler suffered no loss in pay or rank, nor does it appear that her prospects for promotion diminished--on the contrary, she was promoted to store manager when, at her request, she was transferred back to the South Bend area. On the other hand, by Hostetler's description (which at this point is undisputed), the new assignment brought with it a lengthy commute and a marathon work schedule. In these concrete respects, the posting objectively could be viewed as a burdensome one. As a means of remediating the harassment Hostetler claimed to have endured, then, the transfer could be deemed ineffective per se. See Steiner, 25 F.3d at 1464 ("a victim of sexual harassment should not have to work in a less desirable location as a result of the employer's remedial plan"), citing Intlekofer v. Turnage, 973 F.2d 773, 779-80 [& n.9] (9th Cir. 1992) (opinion of Hall, J.), and Ellison, 924 F.2d at 882; Quiroz v. Ganna Constr., 1999 WL 59836, at *22 (N.D. Ill. Jan. 27) (Coar, J.)./10

That Quality had the right to transfer Hostetler, and that such transfers were commonplace, does not stand in the way of such a finding. Quality's authority to transfer Hostetler is not in question; the reasonableness of the transfer as a remedial measure is. Title VII obligates an employer to take appropriate corrective measures when it knows or has reason to know that one of its employees is sexually harassing another. E.g., Guess, 913 F.2d at 465. The employer breaches the duty of care it owes to the harassed employee when the steps it takes in response to the harassment render her job demonstrably and significantly less rewarding or desirable. The harassment might cease as a result of these measures, but the plaintiff is effectively made to bear the costs. See id.

III.

Questions of material fact persist in this case as to the objective severity of the harassment alleged and the propriety of the defendant's response. We therefore REVERSE the entry of summary judgment in favor of Quality and REMAND for a trial.

/1 The transcript of Hostetler's message (the accuracy of which is not in dispute) reads as follows:

There is a situation that occurred this week in the restaurant and I didn't bring it to your attention right away. I took it to Kim (Ridenour) and she hasn't been able to discuss it with you so now I am notifying you because it has been 2 days and you need to know about it.

On Monday (June 3, 1996), I was in the back d.t. and Tim (Payton) came back there and I was running a report and he was talking to me. He grabbed my face and put his lips on mine. I dismissed it, came home and told Mark (boyfriend). I didn't tell him that he actually put his lips on me but I told him he grabbed my face and tried to kiss me. He asked me if I said anything and I told him no, maybe it was a one time thing.

The next day (June 4, 1996), I was doing the bank break, sitting at the computer at the desk and he came up behind me, grabbed my face again and was literally pulling on my face and I put my head between my legs and when I did that he grabbed the back of my bra and, of course, we all know I am well gifted up there, and my bra doesn't have one or two snaps, it has 5 and all of them except one were undone and then later on, I was bending over to get a quarter that fell underneath the desk and my butt was sticking up and he said-- well that looks real good or something like that.

So I told Kim I can put up with them and I am used to working in a restaurant with a bunch of men and that was fine, but there is a point, and that is you don't put your hands on me, you don't kiss me, and you don't undo my bra and I told her that I should be able to handle this myself and I like Tim, he does a good job and is a hard worker, but to me that is something that is unacceptable so I am just letting you know so you can take care of it. If you have any questions, I will be in the restaurant tomorrow between 9 and 3. I'll talk to you later.

R. 27, attachment. We note that Hostetler does not rely on the remark that Payton purportedly made on June 4 when she bent over to retrieve a quarter as evidence of a hostile work environment.

/2 Ridenour avers that during this period, she began to investigate Hostetler's complaint. She spoke with Hostetler herself, of course, and apparently two other female employees approached her to report their own uncomfortable experiences with Payton. Ridenour also spoke with Sabrina Ludwig, who by Hostetler's account had walked into the office when Payton was unfastening her bra, but Ridenour cannot recall what, if anything, Ludwig said about the incident.

/3 Kochan and Ridenour recount the June 10 meeting differently. Kochan asserts that he and Ridenour actually met with Hostetler twice on that date. At the first meeting, according to Kochan, Hostetler elaborated on her complaint. Kochan assured her that harassment would not be tolerated and that an investigation would be commenced immediately. Kochan and Ridenour later met with Payton (who denied Hostetler's allegations), and Kochan admonished him that even if events had not transpired "exactly as Ann said," anything that might be construed as sexual harassment was inappropriate and if not stopped would result in disciplinary action. Kochan Dep. 22. Then, according to Kochan, he and Ridenour met with Hostetler a second time. At that point, he informed Hostetler that Payton had denied the allegations, but that he and Ridenour had apprised him of the company's policy on sexual harassment and Payton had promised not to engage in any behavior "that could be misconstrued as offensive or sexual harassment at all." Kochan Dep. 22. Kochan indicates that after this second meeting with Payton, he briefed Bill Wargo, of Quality's human resources department, on the situation, and Wargo assumed responsibility for the investigation. Kochan's understanding was that Wargo continued to look into the matter until, at some later date, Payton quit his employment with Quality.

For her part, Ridenour remembers only one meeting with Hostetler. Her version posits an initial meeting between Kochan, Payton, and herself, during which Payton denied having harassed Hostetler but was warned that such behavior was inappropriate and should cease. Payton "said he was an overly friendly type person, he liked to give hugs and things like that, and Jim [Kochan] told him that could be construed as sexual harassment in some cases." Ridenour Dep. 26. Ridenour considered Payton to

have been disciplined at that point. Only then, by Ridenour's account, did she and Kochan meet with Hostetler. At that time, Hostetler was informed that Payton had denied the allegations. Later that same day, according to Ridenour, she spoke with Hostetler again, at which time Hostetler indicated to her that the situation had been resolved to her satisfaction.

/4 At some time between June 10 and June 12, Hostetler discovered a bank deposit missing from the safe at the Ireland Road restaurant. On June 12, the day she was transferred, someone from Quality's security department spoke with her about the missing money and asked her to submit to a polygraph examination. Hostetler agreed. Although her testimony is not entirely clear on this point, see Hostetler Dep. 74, 75, it appears that she may have submitted to one examination, the results of which she never learned. Payton also submitted to a polygraph, and after he did so, Hostetler was asked for a second time to do the same. Again, she agreed. However, when she arrived for the examination, she was asked to sign paperwork acknowledging that the inquiry would cover not only the missing deposit but her sexual harassment complaint as well. At that point, she declined to submit to the examination, indicating that she wished to speak with her attorney. Hostetler avers that Payton eventually was determined to have absconded with the money, was turned over to the police, and was incarcerated as a result. We can find no independent evidence in the record confirming her testimony on that point, however.

/5 Kochan may have participated in this meeting. Quality asserts that he did, Quality Br. 11, but the limited excerpts from Hostetler's deposition in the record do not make this clear.

/6 As evidence of what Hostetler asked her employer to do, her remark might have some bearing on our assessment of the adequacy of Quality's response to the alleged harassment. See Garrison v. Burke, 165 F.3d 565, 571 (7th Cir. 1999) (noting that plaintiff did not express dissatisfaction with warnings given to harasser). As we discuss below, however, Hostetler's contention that Quality's response was negligent focuses on the company's delay in acting and on its decision to transfer her, not on its omission to deal with Payton more firmly.

/7 We noted at the outset that Quality's subsidiary, Bravokilo, actually owns the restaurants involved in this case. Quality does not dispute that it is the appropriate defendant here, however.

/8 The district court construed Kochan's affidavit

to admit that Quality transferred Hostetler partly to resolve her harassment allegations. See 1998 WL 456436, at *6, citing Kochan Aff. para. 18. In fact, Kochan merely states that he was aware of the personality clash between Ridenour and Hostetler long before the harassment charge. Id. Kochan goes on to specifically deny any connection between the transfer and Hostetler's allegations against Payton. Id. para. 19.

/9 Nor is she claiming that the transfer was retaliatory. Cf. Collins v. Illinois, 830 F.2d 692, 701-06 (7th Cir. 1987). We have highlighted the evidence tying the transfer to her harassment complaint simply to explain why the factfinder could conclude that the transfer was intended to remediate the harassment complaint. See Steiner v. Showboat Op. Co., 25 F.3d 1459, 1465 (9th Cir. 1994), cert. denied, 513 U.S. 1082, 115 S. Ct. 733 (1995).

/10 See also EEOC Compliance Manual (CCH) sec. 615.4(a)(9)(iii), para. 3103, at 3210 (2000) (to determine whether employer took appropriate corrective action in response to co-worker harassment, EEOC will consider "[w]hether it fully remedied the conduct without adversely affecting the terms or conditions of the charging party's employment in some manner (for example, by requiring the charging party to work less desirable hours or in a less desirable location)").