In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-2108

AMY SWYEAR,

*Plaintiff-Appellant,*

*v.*

FARE FOODS CORPORATION,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:16-cv-01214-SMY-RJD — **Staci M. Yandle**, *Judge.*

SUBMITTED OCTOBER 29, 2018[*] — DECIDED DECEMBER 26, 2018

Before BAUER, EASTERBROOK, and SCUDDER, *Circuit Judges*.

BAUER, *Circuit Judge.* Amy Swyear filed this action against her former employer, Fare Foods Corporation, alleging sexual

---

[*] After examining the briefs and record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and record. *See* Fed. R. App. P. 34(a)(2)(C).

discrimination, sexual harassment, and retaliation in violation
of Title VII, and breach of contract. After the parties each
moved for summary judgment, the district court granted
Fare Foods' motion on all claims. For the reasons set forth
herein, we affirm the decision of the district court.

## I. BACKGROUND

We present the facts in a light most favorable to Swyear.
When a disputed fact arises we note it, but because this case
was decided against Swyear on summary judgment, we must
construe the facts in a light most favorable to her. *See e.g.,*
*Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 802 (7th Cir. 2000).

Fare Foods Corporation is in the business of selling conces-
sion products and equipment. It is owned by Ron and Laura
Porter and headquartered in Du Quoin, Illinois. The company
employs both inside and outside sales representatives, the
operative distinction being that inside sales representatives
work in an office setting in Du Quoin, whereas outside sales
representatives travel to various locations, at least part of the
time, to serve clients and drum up new business.

Amy Swyear was interviewed several times for a position
as an outside sales representative at Fare Foods. On June 18,
2015, Swyear met with Scott Harsy, the company's human
resources supervisor, Robbie Williams, the company's sales
manager, and Ron Porter to discuss the position.[1] At this

---

[1]  The parties do not agree on whether Porter was present at this meeting.
Porter claims he was not present but Swyear claims he was. However, Fare
Foods' verified response to Swyear's complaint in the Illinois Department
(continued...)

meeting, Swyear claims Porter indicated that she would be the first female outside sales representative.[2] Swyear also claims Porter expressed concern regarding her ability to perform effectively in a field dominated by men at this meeting. However, Porter later testified that he liked the idea of hiring a woman because they could get men to do things like unload the delivery trucks or make sales:

Q: How does [a sales representative's assisting drivers with deliveries] relate to having sex appeal?

A: Female gender, in my opinion, have the ability to make males unload trucks for them.

Q: Did you say that to some of your employees prior to Amy being hired?

A: No.

Q: Did you feel Amy had that ability?

A: Yes.

Q: Did you feel that female sales representatives also had the ability to make sales towards male customers?

A: Yes.

Q: Is that one of the reasons why you hired Amy?

[1] (...continued)
of Human Rights states, "Prior to her start date … Ron Porter …, Williams, and Harsy met with Swyear on June 18, 2015, to discuss her employment and Fare Foods' expectations."

[2] Porter testified at his deposition that Fare Foods employed several female outside sales representatives before Swyear.

A:  No.

Porter also testified to the following:

Q:  Did you have any impressions or hesitations towards having a female staff member being on the road alone?

A:  No.

Q:  No hesitations about their safety?

A:  Well, I've always got a fear about somebody's safety.

Q:  But because they're female?

A:  I just think that's in our genetics.

Q:  Genetics?

A:  Yes. We're supposed to be the protector of the female gender. We are the male.

Q:  So you feel that the men of the world are supposed to protect the women?

A:  I think the Lord believed that, yes.

Q:  Have you sent female sales staff on the road alone before?

A:  Yes.

Nevertheless, the aforementioned meeting resulted in the parties agreeing Swyear's first day of work at Fare Foods would be June 22, 2015.

Shortly after her employment began, Swyear noticed the environment at Fare Foods was at times unprofessional. Male employees were often referred to by offensive nicknames such as "Bitchy Ritchie" and "Nips." One female customer who ran

a concession called "Conti's" and was thought by the employees of Fare Foods to be a challenging customer was given the nickname "Cunty." Another female customer was referred to as "Big Tittie Blonde Carnie." The staff also openly discussed the sexual activities of outside sales representative Russell Scott and disparaged the women he associated with. Williams, the manager of the sales team, attempted to pretend these conversations were not happening, putting his fingers in his ears to demonstrate he was blocking it out. Swyear overheard coworkers talk about how one female employee dressed inappropriately and also testified that she was reprimanded by Williams for wearing shorts to the office on one occasion.

Swyear testified that Porter was present when many of the above-described inappropriate conversations took place, but was not sure whether he actually heard them. Porter testified that he was aware of the offensive nicknames, and may have used them on occasion, but could not recall any specific instances in which he did. Swyear did not tell anyone she was offended by the above-described incidents, nor did she make any formal or informal complaints. Swyear did tell Williams that the environment was not overly sexualized, but it was aggressive, disrespectful, and rude, and she also related her surprise at the disrespect the employees directed at Williams himself.

On July 15, 2015, Swyear met Russell Scott at a county fair near East Moline, Illinois. The two walked through the fair together to meet with customers. One customer asked what they had planned for the day. Scott responded that they were getting a hotel room. When the customer responded it was none of his business, implying he understood the statement to

mean Scott and Swyear planned on sharing a room, Swyear immediately pointed out they would be staying in separate rooms.

After completing their work at the fair, Swyear sought permission from Williams to move toward her next location, but Williams told Swyear to stay with Scott to receive additional training. So the two made their way to a hotel in Bentonville, Iowa, and after checking in, discovered their rooms were adjacent to one another. Scott followed Swyear into her room claiming he wanted to check the air conditioner because the room was warm. To avoid spending time with Scott in her room, Swyear suggested they head to dinner. On the way to dinner Scott began acting in a way that implied he believed the two were on a date—touching Swyear's arm, pulling her chair out for her to sit, placing his hand on her lower back, standing in close proximity. Scott had three beers during dinner and told Swyear several times that he was single. According to Swyear, Scott also became unsteady on his feet and began slurring his words as a result of the drinks.

After dinner the two took a self-guided tour of the hotel. When they walked by the pool Scott suggested they go for a swim. When Swyear stated that she did not bring a swimsuit, Scott responded by implying they could go skinny dipping. Swyear declined this offer. On the way back to their rooms, Scott again touched Swyear's back which made her uncomfortable. Upon arriving at their rooms Scott made his way into Swyear's room. Scott crawled into Swyear's bed and told her he liked to watch movies and cuddle. Scott suggested Swyear needed a "cuddle buddy" and that they could share a bed. Swyear declined and told him she was tired and wanted to go

to bed. Scott left, but returned and knocked on Swyear's door multiple times. To avoid further contact with Scott, Swyear pretended to be in the shower. Scott then called Swyear, but she decided not to answer. Swyear answered a subsequent call from Scott and he asked what she was doing. She responded that she had taken a shower and was planning on going to bed. Scott indicated he would meet Swyear for breakfast the next morning and make sure she was okay, and then began mumbling incoherently. Scott called Swyear the next morning from the road and claimed he knocked on her door to see if she would drive him to Walmart because he was too intoxicated to drive himself. The above-described interactions with Scott offended Swyear and made her uncomfortable, but she always felt in control of the situation.

On July 23, 2015, Swyear met with Williams and Harsy for a performance review. During the review they discussed how Swyear could improve her performance and remedy her tardiness issues. Approximately thirty minutes after this meeting Swyear reported to Harsy what happened between her and Scott on July 15. Harsy investigated the incident, calling Scott who confirmed most of the details. After speaking with Scott, Harsy met with Porter and Williams and they decided no discipline was warranted, although they did decide to keep Scott and Swyear separated from then on.

Up to this point of her employment, Swyear had spent roughly half of her time in the Du Quoin office and half on the road. After reporting the incident, however, Swyear spent almost all of her time in the office. Swyear also asserts that after reporting the incident her interactions with Porter ceased. Swyear claims she and Williams discussed plans for her to go

on the road on several occasions, but that Williams indicated he needed approval from Porter and never provided her with any further information.

Harsy and Williams held a second performance meeting with Swyear on August 3, 2015. During this meeting they gave Swyear 30 days to improve her performance. A detailed discussion regarding her performance followed and Williams reiterated Swyear must follow the schedule she was given and discussed her continuing punctuality issues. Williams also informed Swyear that she may only use company vehicles for work-related activities and never for personal use. Despite this warning, Swyear drove a company vehicle home after the meeting. Williams called Swyear and asked her if she understood this was an impermissible use as outlined in their conversation. Swyear immediately returned the vehicle to Fare Foods.

On August 6, 2015, Fare Foods terminated Swyear. Swyear filed a complaint in federal district court alleging sexual discrimination, sexual harassment, and retaliation in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, and breach of contract. Both parties moved for summary judgment and the district court granted Fare Foods' motion and denied Swyear's motion. Swyear's timely appeal asserts the district court was wrong regarding each claim. Because we disagree, we affirm the decision of the district court.

## II. ANALYSIS

Our review of a district court's grant of summary judgment is *de novo* and all reasonable inferences are drawn in favor of the nonmovant. *Valenti v. Lawson*, 889 F.3d 427, 429 (7th Cir.

2018). The operative inquiry is whether the movant has shown there is no genuine dispute as to any material fact and the movant is entitled to a favorable judgment as a matter of law. Fed. R. Civ. P. 56(a).

## A. Sexual Harassment

A sexual harassment claim under Title VII requires Swyear show: (1) her work environment was objectively and subjectively offensive, (2) the harassment she complained of was based on her gender, (3) the conduct was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment, and (4) there is a basis for employer liability. *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 900 (7th Cir. 2018); *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009).[3] A successful hostile work environment claim based on sexual harassment need not involve sexual conduct, but can be successful by showing the work environment was sexist. *Scruggs*, 587 F.3d at 840 (7th Cir. 2009). Thus, this Court has held that a showing of "anti-female animus" is sufficient to prevail in a hostile work environment claim. *Id*.

This showing must still include evidence that the environment was "severe or pervasive"and requires proof of both an objective and subjective component. *Lapka v. Chertoff*, 517 F.3d

---

[3]  It must be noted, as this Court has previously, that the phraseology of this test often oscillates between multiple iterations, however, these differences are without distinction. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 900 (7th Cir. 2018) ("Sometimes our cases phrase the test differently … [i]n the end we have concluded the inquiry is the same.").

974, 983 (7th Cir. 2008). Here, Swyear testified she found the environment at Fare Foods to be sexist and offensive establishing the subjective prong. But to determine whether a particular work environment is objectively offensive, we must consider the severity of the conduct, its frequency, whether it is merely offensive as opposed to physically threatening or humiliating, and whether it unreasonably interfered with an employee's work performance. *Robinson v. Perales*, 894 F.3d 818, 828 (7th Cir. 2018).

To establish the standard plaintiff was required to meet the district court stated "it has been long established that the concept of sexual harassment is designed to protect women from the kind of male attentions that can make the workplace hellish for women." While "hellish" was once the standard, it is no longer. "The Supreme Court standard dictates that the discrimination just be only so severe or pervasive so as to affect the terms and conditions of employment. . . . This is a far cry from hellish." *Johnson*, 892 F.3d at 901 (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21–22 (1993)).

In making this determination we look to the totality of the circumstance and ask whether everything together constitutes a hostile or abusive environment. *See Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993) ("[W]e can say that whether an environment is 'hostile' or 'abusive' can be determined only by looking at all of the circumstances"). We also assume employees are generally mature individuals with the thick skin that comes from living in the modern world. *Passananti v. Cook Cty.*, 689 F.3d 655, 667 (7th Cir. 2012). As a result, employers generally do not face liability for off-color comments, isolated

incidents, teasing, and other unpleasantries that are, unfortunately, not uncommon in the workplace. *Id.*

Swyear argues the environment at Fare Foods, as a whole, was permeated with sexism sufficiently severe and pervasive to create an abusive work environment. Although we recognize the environment at Fare Foods was at times inappropriate and offensive, we do not believe Swyear has met this high bar. This Court has held that "occasional vulgar banter, tinged with sexual innuendo of coarse or boorish workers generally does not create a work environment that a reasonable person would find intolerable." *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 463 (7th Cir. 2002). The vulgar nicknames and the discussions of Russell Scott's romantic life fall into this category. The nicknames were not directed towards Swyear, nor were they used to physically threaten or humiliate her. Rather, they were crude and immature jokes that typically do not result in employer liability.

Additionally, the discussions of Russell Scott's romantic relationships were inappropriate and in poor taste, but they also lacked severity and were infrequent. When asked how often these discussions took place Swyear responded, "I wouldn't know that I would say at least once a week, but it seemed like an ongoing joke." Furthermore, no one ever discussed the topic with Swyear directly, she merely overheard other employees joking about it. This militates a finding that the conversations were "merely offensive," as opposed to physically threatening or humiliating to Swyear. In fact, Swyear stated that she did not feel disrespected herself, but was troubled by the disrespect the employees showed to each

other: "the all over disrespect I felt on behalf of everyone towards each other was a little distasteful and rude."

The same goes for the nicknames. Swyear was not given an offensive nickname herself, but merely heard people using them while she was in earshot. This Circuit has aptly pointed out, "The American workplace would be a seething cauldron if workers could with impunity pepper their employer and eventually the EEOC and the courts with complaints of being offended by remarks and behaviors unrelated to the complainant except for his having overheard, or heard of, them." *Yuknis v. First Student, Inc.*, 481 F.3d 552, 556 (7th Cir. 2007).

Nor does the addition of Swyear's interaction with Russell Scott on July 15, 2015, necessitate a finding that the environment at Fare Foods was hostile or abusive. In *Hostetler*, this Court discussed the difficult line drawing this inquiry requires:

> Cumulatively or in conjunction with other harassment, such acts might become sufficiently pervasive to support a hostile environment claim, but if few and far between they typically will not be severe enough to be actionable in and of themselves. A hand on the shoulder, a brief hug, or a peck on the cheek lie at this end of the spectrum. Even more intimate or more crude physical acts—a hand on the thigh, a kiss on the lips, a pinch of the buttocks—may be considered insufficiently abusive to be described as "severe" when they occur in isolation.

218 F.3d at 808. The incident with Scott reflected entirely inappropriate behavior by a coworker, but does not constitute

sexual harassment alone or when considered with the above-described incidents. Scott's actions were not severe as compared with acts this Court has found sufficient to create a hostile or abusive work environment. *See e.g., Hostetler*, 218 F.3d at 809 (plaintiff's coworker held her face in his hands, forced his tongue into her mouth and when she used her body to shield herself he began to unfasten her bra, stopping only when another employee entered the office); *Smith v. Sheahan*, 189 F.3d 529, 532 (7th Cir. 1999) (a coworker physically assaulted the plaintiff and had a history of verbally abusing female coworkers). Here, Scott's actions were much less threatening and severe—in particular, none of his actions were forceful and Swyear testified that she always felt she was in control of the situation. *Cf. Hilt–Dyson*, 282 F.3d at 463–64 (plaintiff's allegations that a supervisor rubbed her back, squeezed her shoulder and stared at her chest during a uniform inspection while telling her to raise her arms and open her blazer were isolated incidents that, even when taken together, did not create a hostile work environment); *Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir.2002) (plaintiff's complaints of eight gender-related comments during course of her employment, including that "the only valuable thing to a woman is that she has breasts and a vagina," was insufficient to demonstrate a hostile work environment). Scott certainly crossed far beyond the line of acceptable workplace etiquette, but his actions were not as offensive as this Court has required to constitute a hostile or abusive work environment. Additionally, Scott's inappropriate actions happened only once, were not part of a pattern of harassment, and were immediately and sufficiently responded to by Fare Foods.

Swyear also failed to show the environment at Fare Foods interfered with her ability to do her job. To the contrary, Swyear testified the main impediment to her job performance was conflicting directives:

> I had to be honest that from the very beginning that something was off and I didn't—you know, I was getting direction from so many different people that was conflicting and … I'm getting, you know, not punished, but talked to about something that the other person would say it was okay. It was just very confusing and I don't … like the chaos.

Accordingly, because we find that the environment at Fare Foods as a whole was not sufficiently severe or pervasive to constitute a hostile work environment, and because Swyear failed to put forth evidence showing it adversely affected her job performance, we affirm the decision of the district court to grant summary judgment in favor of Fare Foods.

## B.  Sexual Discrimination

Title VII makes it unlawful for an employer to discharge an employee because of that person's sex. To succeed on a sexual discrimination claim, a plaintiff must establish (1) she is a member of a protected class, (2) she was meeting the legitimate performance expectations of her employer, (3) she suffered an adverse employment action, and (4) another similarly situated individual not in the protected class was treated more fairly. *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012). The parties have not framed their arguments using the *McDonnell Douglas* burden shifting framework, but rather have simply

disputed whether sufficient evidence has been produced to support a jury verdict. Following *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 764 (7th Cir. 2016), this Court had made clear that "*McDonnell Douglas* is not the only way to assess circumstantial evidence of discrimination." *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). Without the *McDonnell Douglas* framework the question is a familiar one: "has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?" *Id.*

The parties agree that Swyear is a member of a protected class (a woman) and that she suffered an adverse employment action (being fired). The parties dispute, however, whether Swyear was meeting Fare Foods' legitimate performance expectations and whether Swyear has produced evidence that another similarly situated individual that was not a member of the protected class was treated more favorably. Because we agree with Fare Foods on the former issue, we will not discuss the latter.

Fare Foods attached to their summary judgment motion an exhibit detailing Swyear's performance issues.[4] Fare Foods documented that Swyear was late on a particular day early in her employment causing deliveries to be backed up for her and a coworker. On another occasion, Williams noticed Swyear was

---

[4]   Some of the dates appear to be incorrect in this document for some actually predate Swyear's hire date.

still at a hotel at 12:30 p.m.[5] and called Swyear to inquire as to why she was not following the route designed for her to meet specific customers, an issue that would be a common one during Swyear's time at Fare Foods. Williams wrote, "[Swyear] needs to understand we have a process and when the route is set up it needs to be followed as set up." On July 14, Swyear was delivering frozen goods to a customer when she decided to stop at her home before completing the delivery—this made the delivery late. On the same day Swyear, after seeking permission, met her mother at a show in Crescent City, Iowa. However, the following work day Swyear stayed there until 2:00 p.m., again failing to follow the route set up by Fare Foods. On July 27, Swyear was issued a ticket for being on her cell phone while driving. Swyear was in her personal vehicle, but Williams was concerned the ticket would adversely affect Fare Foods insurance and asked Swyear to take care of it. On July 30, Williams set up a plan for Swyear to visit customers in two locations, one in Salem, Illinois, and the other in Greenville, Illinois. When Williams checked in with Swyear at 9:30 a.m. she was not on the road, even though she was expected to be working by 8:00 a.m. Williams checked her location at 10:20 a.m. and discovered that she was in Belleville, Illinois, which was in the opposite direction from the agreed upon locations. Swyear did not arrive to one of the locations set up by Fare Foods until 2:00 p.m.

---

[5]  Fare Foods equipped the company vans with devices so they were able to monitor the movement of the outside sales representatives, which is how Williams was able to determine Swyear's location at any given time.

Furthermore, as described above, Swyear had performance evaluations conducted by Williams and Harsy on July 23, 2015, and August 3, 2015. During the July 23, 2015, meeting they discussed how Swyear could improve her performance and her tardiness issues. The August 3 review also addressed these same issues and resulted in Swyear being given 30 days to improve her performance. Furthermore, directly after Williams informed Swyear that she could only use company vehicles for work-related activities, Swyear drove a company van home. These issues taken together are convincing evidence that Swyear was not meeting Fare Foods' legitimate expectations.

Swyear advances several arguments to rebut this evidence, none of which dispute the veracity of the above-described incidents. First, Swyear argues Fare Foods changed Swyear from an outside sales representative to an inside sales representative following the incident with Scott, thus changing Fare Foods' expectations in her performance without her knowing. Swyear effectively asserts this secret change in expectations resulted in illegitimate expectations, thereby excusing her failure to prove the "legitimate performance expectations" prong of the sexual discrimination test. However, Swyear does not show any instances in which she was held to the standard of an outside sales representative while she was supposed to be performing the functions of an inside sales representative, nor does she point to any evidence that the confusion over Swyear's role led to her not meeting Fare Foods' legitimate expectations. Most of the above-described incidents are examples of Swyear failing to meet Fare Foods' expectations while she was undeniably an outside sales representative. Thus, Swyear has not demonstrated that her failure to follow

directives or her frequent tardiness were a result of confusion as to which position she held.

Swyear also claims "this Court's jurisprudence allows the plaintiff to challenge the basis of her adverse actions as the court need not accept the employer at its word." True enough, but Swyear has not pointed to any evidence in the record that implies Fare Foods' reasons for firing her were pretextual, nor has she pointed to any evidence that implies the real reason she was fired was due to her sex. The fact that Swyear has not produced any evidence that she was meeting Fare Foods' legitimate expectations or that the reasons Fare Foods gave for firing her were pretextual are fatal to her sexual discrimination claim. Accordingly, we affirm the district court's dismissal of this claim.

## C.  Retaliation

Swyear's retaliation claim meets the same fate as her sexual discrimination claim for many of the same reasons. Title VII forbids employers from retaliating against employees for engaging in statutorily protected activities by opposing an unlawful employment practices or participating in the investigation of one. 42 U.S.C. § 2000e–3(a); *see also Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016). To determine whether Swyear's retaliation claim should survive summary judgment, we ask whether the evidence produced would permit a reasonable factfinder to conclude the plaintiff's sex caused the discharge. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

There are two ways of proving a *prima facie* retaliation claim and each requires proving different elements. A plaintiff

opting for the "direct" method must present evidence that (1) she engaged in a protected activity, (2) she suffered an adverse action, and (3) a causal connection exists between the two. *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003). The "indirect" method, as the name implies, allows the plaintiff to establish a *prima facie* case without establishing a causal link. This method requires a plaintiff show (1) she engaged in a protected activity, (2) she performed her job duties according to her employer's legitimate expectations, (3) she suffered an adverse action, and (4) she was treated less favorably than similarly situated employees who did not engage in the protected activity. *Id.* The indirect method falls under the auspices of the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, if a plaintiff is able to establish a *prima facie* case, the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the adverse action. *Khowaja v. Sessions*, 893 F.3d 1010, 1015 (7th Cir. 2018). Then to prevail, Swyear must present evidence that the reasons proffered by Fare Foods are pretextual. *Id.*

As was discussed in more detail above, Swyear can point to no evidence that she was meeting the legitimate expectations of Fare Foods, nor has she produced any evidence that indicates the reasons Fare Foods fired her are pretext. As a result, her retaliation claim is fatally deficient and summary judgment was appropriate.

### D.  Breach of Contract

Finally, Swyear argues Fare Foods is liable for breach of contract under Illinois law. An employment agreement signed by an at-will employee can create valid and enforceable contractual rights if the traditional requirements for contract formation exist. *Duldulao v. St. Mary of Nazareth Hosp. Ctr.*, 505 N.E.2d 314, 318 (Ill. 1987). Under Illinois law exists a presumption that an individual hired without a fixed term is an at-will employee, which can be overcome by demonstrating the parties contracted otherwise. *Id.* That "otherwise" requires a plaintiff show: (1) the policy contained a promise of such clarity that an employee would reasonably believe an offer has been made, (2) the statement was disseminated to the employee in a manner that makes the employee aware of its content and reasonably believe it was an offer, and (3) the employee accepted the offer by commencing or continuing to work after learning of the policy. *Id.*

Swyear argues Fare Foods breached her employment agreement by reassigning her to the position of inside sales representative, by failing to provide her with a company credit card, and by taking her company vehicle. In what Swyear purports to be the parties' employment agreement, although it is not signed by either party or dated, the aforementioned benefits are contemplated. The first page of the agreement states that Swyear will work as an outside sales representative. The second stated she would be provided with a company credit card and company vehicle.

The parties do not dispute that Swyear has satisfied the test in *Duldulao*, although Swyear points to no case law finding

contractual rights in similar employment provisions nor did the Court find any in its independent research. Nevertheless, the Court need not decide that issue because even if Swyear satisfied *Duldulao*, that would only establish that the relationship at issue is not merely at-will.

Under Illinois law, to prevail on a breach of contract claim the plaintiff must show: (1) the existence of a valid and enforceable contract, (2) she substantially performed the contract, (3) the defendant breached that contract, and (4) damages resulted from the alleged breach of contract. *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (citing *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. App. Ct. 2004)). Appellants spend about two pages discussing the breach of contract issue, and most of it was devoted to discussing why the employment was not at-will. Thus, the Court was given no guidance as to how the appellants would be able to prove breach or damages.

It is unclear here how appellant would prove damages for Fare Foods' failure to provide Swyear with a company credit card during her employment. Nor is it readily apparent how Swyear would show her reassignment resulted in damages. She was never officially reassigned, but merely ceased traveling after the incident. Her salary was not changed and it appeared many of her duties in the office were the same. Finally, appellants do not explain how Fare Foods breached the part of the agreement that Swyear would be provided with a company vehicle. The record is replete with instances of Swyear using a company vehicle. Fare Foods did require Swyear to only utilize a company van for employment-related activities, but at no time did Fare Foods forbid Swyear from

using it. Because Swyear failed to develop these issues at all in her briefs, despite the fact that Fare Foods' main argument in their brief was that Swyear had not alleged damages, she has waived the issue. *See Echo, Inc. v. Timberland Machines & Irrigation, Inc.*, 661 F.3d 959, 967 (7th Cir. 2011) (three sentence argument that failed to explain how the contract was breached was "too skeletal, and amounted to waiver").

## III. CONCLUSION

Because we find the environment at Fare Foods as a whole was not sufficiently severe or pervasive to constitute a hostile work environment, we affirm the district court. Further, because Fare Foods set forth numerous legitimate reasons for termination that Swyear failed to rebut with evidence, the district court was correct in granting summary judgment in favor of Fare Foods for Swyear's sexual discrimination and retaliation claims. Finally, because Swyear failed to establish the elements of breach of contract, summary judgment was appropriate for this claim as well. AFFIRMED.