In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-1155

KHALID KHOWAJA,

*Plaintiff-Appellant*,

*v.*

JEFFERSON B. SESSIONS III, Attorney
General of the United States,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:16-cv-00983-NJ — **Nancy Joseph**, *Magistrate Judge.*

ARGUED MAY 17, 2018 — DECIDED JUNE 27, 2018

Before BAUER, EASTERBROOK, and MANION, *Circuit Judges*.

BAUER, *Circuit Judge.* Khalid Khowaja served as a Special Agent (SA) in the Federal Bureau of Investigation's Milwaukee field office for nearly a year before his employment was terminated. Khowaja brought this lawsuit under Title VII, alleging that he was discriminated against and terminated from the FBI, and that he was subject to disparate treatment,

because he is Muslim. The district court granted summary judgment in favor of the Attorney General, and we affirm.

## I.  BACKGROUND

Prior to joining the FBI, Khowaja served as an Immigration Enforcement Agent with the Department of Homeland Security, Immigration and Customs Enforcement from 2008 to 2012. On February 26, 2012, he began employment with the FBI as a SA on a two-year probationary term. He was assigned to the Milwaukee field office and placed in the office's Joint Terrorism Task Force.

Probationary SAs are evaluated using the FBI's "Suitability Standards for Probationary Employees," which include the following six "dimensions:" (1) conscientiousness; (2) cooperativeness; (3) emotional maturity; (4) initiative; (5) integrity and honesty; and (6) judgment. A deficiency in any one of these dimensions can result in a SA's removal.

During his employment, Khowaja's judgment, or lack thereof, was frequently cited as an area of concern by his immediate supervisor, Supervisory Special Agent (SSA) Mark Green, which ultimately formed the basis for his termination. On June 17, 2013, a recommendation for removal report was approved by SSA Green as well as the field office's Special Agent in Charge (SAC), Teresa Carlson, and the Assistant Special Agent in Charge (ASAC), G.B. Jones. The report listed several instances where Khowaja demonstrated a lack of suitability in the judgment dimension. Importantly, Khowaja does not dispute that any of these instances occurred.

In October 2012, Khowaja went to a local jail to recruit an inmate as a Confidential Human Source (CHS), but failed to provide *Miranda* warnings before interviewing the inmate. SSA

Green counseled Khowaja about this mistake, and noted that he should have known to administer *Miranda* warnings to an individual in custody given his prior law enforcement experience. Rather than accept this counsel, Khowaja argued with SSA Green and defended his actions.

In another instance, Khowaja was instructed, and ultimately failed, to properly coordinate with local law enforcement officials before taking investigative actions. In December 2012, Khowaja was working an investigation of a threatening subject in West Bend, Wisconsin, which the local police had been involved with from the beginning. Without coordination from local law enforcement or approval from his supervisors, Khowaja independently interviewed administrators at the West Bend High School regarding the subject. The administrators were alarmed at the FBI's involvement and contacted the local police, who in turn were angered that they had no prior knowledge of Khowaja's actions. Khowaja initially defended his actions to the local police chief, but he later admitted his mistake after being counseled by SSA Green.

The report also cited other instances where Khowaja demonstrated a disregard for his supervisors' authority. For example, Khowaja needed repeated reminders from his supervisors not to undertake interviews of certain subjects. In addition, he disregarded an instruction to maintain a lower profile with a CHS and avoid meeting the CHS in public. Finally, the report cited his avoidance of senior agents in favor of working with agents junior to him, specifically noting an instance where Khowaja brought an untrained and unarmed intelligence analyst into a dangerous area of Milwaukee to contact a potential source.

In summary, the report found that Khowaja had demonstrated poor judgment since his arrival at the field office, but that his supervisors had hoped training and cultivation of relationships with senior agents would reverse this trend. Instead, the report concluded, Khowaja's arrogance, his avoidance of senior agents, and his defensiveness when corrected about his mistakes had hindered his judgment.

Additionally, Khowaja's performance assessments throughout his employment repeatedly highlighted his judgment as an area of concern. During his tenure as a SA, Khowaja's performance was evaluated by SSA Green and others in five "Performance Summary Assessments" (PSA), a "Performance Appraisal Report" (PAR), and in a "6 month New Agent Assessment" (NAA). In his second PSA for the period of September 14, 2012, to October 14, 2012, the assessment noted that Khowaja should use good judgment and develop relationships with senior agents. His third PSA for the period of November 14, 2012, to January 14, 2012, stated that "[p]rofessional judgment has been an issue … that must be improved." The assessment cited to another instance involving Khowaja's lack of coordination with local law enforcement, and concluded that "if his current judgment cannot improve he is unlikely to succeed in the FBI."

Khowaja's six-month NAA highlighted an "unacceptable" rating in the judgment dimension. While the assessment concluded that Khowaja was still suitable for continued employment as a probationary SA, it included a "plan of action" to address Khowaja's judgment deficiency. His fifth PSA for the period of March 14, 2013, to May 14, 2013, stated that he had "shown deficiencies in judgment on a regular basis," and that "[h]is lack of judgment requires much closer

supervision of his work than would be expected of a special agent."

In late February of 2013, around the time Khowaja's six-month NAA was completed, Khowaja's supervisors inquired of the "Performance Appraisal Unit," a section of the Human Resources Division, about his probationary status and potential termination. By May 3, 2013, SSA Green had provided Human Resources with a draft recommendation for removal report, approved by SAC Carlson and ASAC Jones. On May 16, ASAC Jones and SSA Green met with Khowaja for his file review and informed him that his removal was being sought. Seven days later, Khowaja began the process of filing a formal complaint with the Equal Employment Opportunity Commission (EEOC). The final recommendation for removal report was approved on June 17, 2013, and in a letter dated July 5, 2013, James Turgal, Assistant Administrative Director of the FBI's Human Resources Division, removed Khowaja from his probationary SA position based on his failure to meet all of the suitability standards.

Khowaja's allegations of religious discrimination focus on SSA Green, a white Christian. According to Khowaja, SSA Green asked Khowaja during their first meeting if he was Muslim and questioned him about his faith. SSA Green, who is fluent in Arabic, yelled Arabic holy phrases, such as "Alhamdulillah!" ("praise be to God!"), throughout the office and used such Arabic phrases in emails. Khowaja claims SSA Green used these phrases in a derogatory manner. He also asserts that SSA Green mocked Middle Eastern accents, called a Muslim CHS a "tool," and pointed out the fact that Khowaja is Muslim during a presentation to other agents. Finally, Khowaja also stresses a remark made by ASAC Jones in June

2013 to a local police chief describing Khowaja as "not our typical agent."

As to his disparate treatment claim, Khowaja asserts that he was held to a different standard as his probationary SA peers, particularly with regard to SA Adam Herndon. SA Herndon accompanied Khowaja during the episode where Khowaja failed to administer *Miranda* warnings to an inmate. However, SA Herndon had no prior law enforcement experience and vowed to never let it happen again instead of defending his actions. Additionally, SA Herdon accompanied Khowaja to West Bend High School without the coordination of local police. Importantly, Khowaja was lead investigator on that particular subject and he was ultimately responsible for the lack of coordination.

After exhausting his administrative remedies with the EEOC and the Department of Justice, Khowaja filed this two-count lawsuit on June 8, 2016. Khowaja alleged first that he was unlawfully discriminated against and removed from his position because he is Muslim, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16(a). His claim also contained allegations that he was subjected to a hostile work environment, which Khowaja voluntarily dismissed with prejudice before summary judgment, and subjected to disparate treatment. His second claim alleged that he was intentionally and unlawfully terminated in retaliation for beginning the EEOC process, in violation of 42 U.S.C. § 2000e-3(a).

The district court granted summary judgment in favor of the Attorney General with respect to both claims. On appeal, Khowaja only challenges the court's ruling with respect to his first claim of religious discrimination and disparate treatment.

## II.  DISCUSSION

Summary judgment is appropriate if the moving party has shown there is "no genuine dispute as to any material fact," and is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56(a). We review a grant of summary judgment *de novo*, construing all factual disputes and drawing all reasonable inferences in favor of the non-moving party. *Golla v. Office of Chief Judge of Cook Cty., Ill.*, 875 F.3d 404, 407 (7th Cir. 2017).

Title VII prohibits federal employers from discriminating against federal employees and applicants on the basis of religion. 42 U.S.C. § 2000e-16(a). In *Ortiz v. Werner Enterprises, Inc.*, we held that the "direct" and "indirect" methods of proof in employment discrimination cases must not be treated as distinct legal standards. 834 F.3d 760, 765 (7th Cir. 2016). Rather, all the evidence must be evaluated as a whole, and the legal standard "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's … religion … caused the discharge." *Id.* at 765–66. *Ortiz* made clear that we were only concerned with the proposition of sorting evidence into "direct" and "indirect" piles, and that our holding did not alter the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Id.*

On appeal, Khowaja maintains that he established a *prima facie* case of religious discrimination and disparate treatment under the *McDonnell Douglas* framework. Both claims can be established under the same framework, so we evaluate them together. Thus, Khowaja carries the burden of showing that "(1) [he] is a member of a protected class; (2) [his] job performance met [the FBI's] legitimate expectations; (3) [he] suffered

an adverse employment action; and (4) another similarly situated individual who was not in the protected class was treated more favorably." *McKinney v. Office of Sheriff of Whitley Cty.*, 866 F.3d 803, 807 (7th Cir. 2017) (quoting *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 750–51 (7th Cir. 2006)). If Khowaja can establish a *prima facie* case, the burden shifts to the Attorney General to articulate a legitimate, non-discriminatory reason for terminating his employment. *Id.* Then, Khowaja must present evidence that the proffered reason is pretext. *Id.*

While Khowaja, as a Muslim, is a member of a protected class, and clearly suffered an adverse employment action through his termination, Khowaja's *prima facie* case is doomed by one major hurdle: his job performance clearly did not meet the FBI's legitimate expectations. Probationary SAs are evaluated under the various suitability dimensions, and a deficiency in any one of these can lead to termination. The record conclusively reflects that Khowaja had ongoing judgment-related issues throughout his employment. Khowaja does not contest any of the instances described above and contained in the recommendation for removal report occurred. He admits that he conducted an un-*Mirandized* interview with an inmate in custody, and that he was defensive when counseled by SSA Green. He also admits that he violated protocol when he conducted an interview at the West Bend High School without coordinating with the local police or his supervisor.

Additionally, Khowaja does not dispute that his judgment was repeatedly cited as an issue in his performance assessments. Numerous PSAs noted Khowaja's judgment deficiency, including one from November 2012 to January 2013, which concluded that "if his current judgment cannot improve he is unlikely to succeed in the FBI." Moreover, Khowaja's six-

month NAA rated his judgment as unacceptable, and provided a "plan of action" to address this deficiency. The recommendation for removal report cited Khowaja's lack of suitability in the judgment dimension, and his July 5, 2013, termination letter stated that his employment was terminated for failure to meet the suitability standards. The undisputed facts show that Khowaja was not meeting the FBI's legitimate expectations, and consequently, he cannot establish a *prima facie* case of intentional discrimination or disparate treatment under the *McDonnell Douglas* framework.

Although Khowaja's *prima facie* case fails at the onset, he points us to the fact that SA Herndon was not terminated, even though he was involved in some of the same lapse-of-judgment episodes. Khowaja asserts that SA Herndon serves as a similarly situated co-worker, and that SA Herndon's preferential treatment means the FBI's basis for terminating him is pretext for religious discrimination. The similarly situated and pretext analysis often overlap, as comparator evidence and selective enforcement of an employer's rules are relevant to both inquiries. *See Coleman v. Donahoe*, 667 F.3d 835, 857–59 (7th Cir. 2012).

"Similarly situated employees must be directly comparable to the plaintiff in all material respects," yet this is a flexible inquiry with no magic formula. *Id.* at 846–47 (internal quotation marks and citation omitted). Both Khowaja and SA Herndon were probationary SAs who began their employment in close proximity; SSA Green served as their immediate supervisor; and SA Herndon was involved in both the failure to *Mirandize* episode and the West Bend High School episode.

Despite these similarities on the surface, there are significant distinctions in their treatment that undermine any

comparison. *See id.* at 847 ("In the usual case, a plaintiff must at least show that the comparators … engaged in similar conduct without such differentiating or mitigating circum-stances as would distinguish their conduct or the employer's treatment of them.") (internal quotation marks and citation omitted). First, SA Herndon, like Khowaja, was also counseled by SSA Green for his mistakes after both episodes; he did not escape discipline. Significantly, SA Herndon did not defend his mistakes in either episode, unlike Khowaja. Second, as it relates to the West Bend High School episode, Khowaja was the lead investigator and accordingly, the responsibility fell on him for that mistake. Most importantly, Khowaja's termination and his failure to meet the judgment dimension of the suitability standards was based on numerous other instances lacking SA Herndon's involvement. Khowaja's recommendation for removal report cited judgment-related instances where he disregarded his supervisors' authority to proceed with certain interviews, met with a CHS in public despite being instructed to maintain a lower profile, and failed again to properly coordinate with local law enforcement. Simply put, Khowaja and SA Herndon are not similarly situated, and their compari-sons do not demonstrate disparate treatment or pretext.

Setting aside the *McDonnell Douglas* framework and examining the evidence as a whole, Khowaja presents no evidence that would lead a reasonable factfinder to conclude that he was terminated, or subjected to disparate treatment, because he is Muslim. Khowaja offers no evidence of religious discrimination or animus by SSA Green or any other supervi-sor. True, SSA Green admitted that he inquired about Khowaja's religion during their first meeting, and that he did use Arabic phrases throughout the office given his fluency in the language. However, nothing in the record supports

Khowaja's contention that SSA Green's inquiry into Khowaja's religion was demeaning, or that his use of Arabic phrases or accents was done in a derogatory manner. More importantly, Khowaja fails to demonstrate how any of SSA Green's actions constitute religious discrimination against him, or how these actions are related to his termination. Finally, while ASAC Jones did remark that Khowaja is "not our typical agent," he did so while apologizing to local police about Khowaja's failure to properly coordinate with them. Khowaja offers no evidence that this remark evinces religious animus or was in any way related to the fact that he is Muslim.

## III.  CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment in favor of the Attorney General.

MANION, *Circuit Judge*, concurring in part and concurring in the judgment. I agree with the court that the Attorney General was entitled to summary judgment in this case. I write separately to address a potential point of confusion in applying the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

The magistrate judge in this case held that Khowaja's claims failed simply because he could not show that he was performing up to the FBI's legitimate expectations. The judge cited our decision in *Brummett v. Lee Enterprises, Inc.*, 284 F.3d 742, 744–45 (7th Cir. 2002), for the proposition that an employee who fails to meet his employer's legitimate expectations cannot establish a *prima facie* case under *McDonnell Douglas* unless he can prove that the expectations themselves were a smokescreen for discrimination. Because the FBI's expectations admittedly are not pretext for discrimination, the judge granted summary judgment to the Attorney General. As a result, she did not consider whether Khowaja's colleague, Special Agent Adam Herndon, was a similarly situated employee who was not terminated for comparable conduct.

However, our later cases make clear that a plaintiff can establish a *prima facie* case by showing that the employer's legitimate expectations were disparately applied in his case. As we explained, "[w]hen a plaintiff produces evidence sufficient to raise an inference that an employer applied its legitimate expectations in a disparate manner ... the second and fourth prongs merge—allowing plaintiffs to stave off summary judgment for the time being, and proceed to the pretext inquiry." *Elkhatib v. Dunkin Donuts, Inc.*, 493 F.3d 827, 831 (7th Cir. 2007) (quoting *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th

Cir. 2002) (some internal quotation marks omitted)). Thus, Khowaja could have cleared the *prima facie* hurdle even though he was not performing up to the FBI's expectations. He just had to show that Herndon was a sufficient comparator and was not terminated.

For this reason, the court is not quite correct to say that Khowaja cannot establish his *McDonnell Douglas prima facie* case because he failed to meet the FBI's expectations. Maj. Op. at 9. Nevertheless, the court ably demonstrates that Khowaja and Herndon were not similarly situated. It is this, not Khowaja's poor job performance, that ultimately dooms his case.

I respectfully concur.