In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-2706

LISA PURTUE,

*Plaintiff-Appellant,*

*v.*

WISCONSIN DEPARTMENT OF CORRECTIONS, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 18-cv-204 — **James D. Peterson**, *Chief Judge.*

ARGUED APRIL 15, 2020 — DECIDED JUNE 26, 2020

Before MANION, HAMILTON, and BARRETT, *Circuit Judges.*

BARRETT, *Circuit Judge.* Lisa Purtue was fired from her job as a Wisconsin correctional officer for falsely claiming that a prisoner hit her with an empty snack cake box that he threw from his cell. Video footage revealed that the box did not in fact hit Purtue, and, after a review process, the warden dismissed her for making a false report in violation of Wisconsin Department of Corrections policies. Purtue then filed suit, alleging that she had been fired because of her sex. But because

she failed to identify evidence from which a reasonable jury could draw that inference, we affirm the district court's entry of summary judgment against her.

## I.

Lisa Purtue was a correctional officer at Dodge Correctional Institution, a state prison that serves as an intake institution for inmates who are then transferred to longer-term facilities of varying security levels. The Department of Corrections hired Purtue in 2013, and she worked at Dodge for about three years before the 2016 incident that led to her dismissal.

In April 2016, Purtue filed an incident report alleging that an inmate, Joseph Reddick, had thrown an empty box of Little Debbie snack cakes from his cell, hitting her in the midsection. According to Purtue, she had opened the "trap"—a slot through which food is passed—and offered Reddick his medication. Reddick then threw the box out of the trap and hit her, after which Purtue closed the trap and told Reddick that she understood the box-throwing to be a refusal. As a result of Purtue's report, Reddick was hauled off to segregated detention, hurling insults at Purtue as he was taken from the cell block. Per Department guidelines, the prison referred the incident to the Dodge County Sheriff for criminal investigation and initiated internal disciplinary proceedings against Reddick.

At Reddick's prison disciplinary hearing, he asked the hearing officer to play a video recording of the incident that had been captured by a security camera located across from his cell. The video showed the empty box flying out of Reddick's cell, but it also showed that the box didn't fly in Purtue's direction, much less strike her. In light of this evidence,

the investigators found Reddick not guilty of assault or diso-
beying orders, although he was found guilty of disrespect and
disruptive conduct.

Because of the discrepancy between the video and Pur-
tue's report, Dodge's deputy warden opened an investigation
into Purtue. The Department of Correction's Work Rule 6 pro-
hibits correctional officers from falsifying records or know-
ingly giving false information to prison authorities; violation
of this rule can result in discipline, including termination. To
determine whether Purtue violated Work Rule 6, two investi-
gators interviewed Reddick and Purtue separately. Reddick
stated that he and Purtue had quarreled earlier on the day of
the incident and that he threw the box out of frustration but
purposefully directed it away from Purtue. In her interview,
Purtue reiterated that the box had hit her when she turned
away from the trap and confirmed Reddick's account of the
earlier disagreement between the two.

Investigators then informed Purtue that her description
was inconsistent with the video. After watching the footage,
Purtue agreed that the box had not hit her—yet she main-
tained that something else must have hit her instead. The in-
vestigators doubted that story because on the video Purtue
did not flinch or otherwise react as if something had struck
her. They referred her case to the warden at Dodge, sending
him the investigation report, the video, and other materials.

The warden decided to skip progressive discipline and
immediately terminate Purtue's employment. In doing so, he
relied on Work Rule 6 and the Department's Executive Di-
rective #2, which classifies "[l]ying or providing false infor-
mation" as one of the listed "Serious Acts of Misconduct" that
may result in termination. The warden met with the deputy

warden, Dodge's director of human resources, and a representative from the Department's employment relations office, all of whom agreed with the warden's recommendation to skip progressive discipline.

If a supervisor skips progressive discipline, Department policy requires the employment relations office to prepare a summary memorandum and to identify disciplinary comparators showing that the infraction warrants termination. The memorandum identified three comparators for Purtue—one man and two women—all of whom were fired for lying or falsifying records. Two division administrators approved the report, which then went to a "management advisory team" consisting of an employment relations representative, a representative from the Office of Diversity Equality Services, the Department's director of personnel and human resources, and two representatives from the Office of Legal Counsel. All reviewers agreed that termination was appropriate. After securing final approval from the Department's deputy secretary, Dodge's warden fired Purtue for falsifying a report.

Purtue filed this action, asserting claims for sex discrimination under Title VII and 42 U.S.C. § 1983. To defeat the defendants' motion for summary judgment, she assembled an array of circumstantial evidence: She contended that the defendants mischaracterized her statements, uncritically adopted Reddick's version of events, and exaggerated the potential consequences that Reddick faced as a result of her misstatements. She presented expert testimony from former Wisconsin Department of Corrections Secretary Ed Wall, who opined that Purtue's conduct did not warrant terminating her employment. And she highlighted a report by a University of Wisconsin professor showing that Dodge's termination

patterns tracked those of the Department as a whole, which had fired six percent of its female employees versus three percent of its male employees in the five years before Purtue's dismissal.

The district court granted summary judgment to the defendants. It determined that the investigation accurately summarized Purtue's conduct, that Reddick's version of events was consistent with the video, and that the defendants correctly represented the potential negative consequences to Reddick. It concluded that Wall's testimony was speculative and offered nothing more than his opinion that termination was unwise but not necessarily pretextual. Though the district court found the gender disparities in the statistical report concerning, it concluded that this evidence revealed little about the defendants' decision to dismiss Purtue in particular. After reviewing this evidence, the district court decided that no reasonable jury could find that Purtue's dismissal was based on sex discrimination rather than her violation of Work Rule 6.

## II.

We review the viability of Purtue's claims de novo, construing facts in her favor as the nonmovant, and "we affirm the district court only when no reasonable jury could have found for the plaintiffs." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893–94 (7th Cir. 2018). We evaluate Purtue's § 1983 claims under the same standards as her Title VII claims, so they stand or fall together. *De Lima Silva v. Dep't of Corr.*, 917 F.3d 546, 559 (7th Cir. 2019).

Purtue emphasizes that she is not relying on the burden-shifting framework set out in *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792 (1973), and she is right that she doesn't have to. The familiar *McDonnell Douglas* approach requires a plaintiff to make a prima facie case of discrimination, at which point the burden shifts to the employer to offer a nondiscriminatory motive, and, if the employer does so, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext. *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 719 (7th Cir. 2018). But this framework is just one way that a plaintiff can navigate her way to a jury in a discrimination case. When a defendant moves for summary judgment, the "singular question" for the district court is whether the plaintiff has introduced evidence that would "permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Johnson*, 892 F.3d at 894 (citation omitted). The plaintiff need not rely on the *McDonnell Douglas* method to carry that burden; she may well have other "direct or circumstantial evidence that supports an inference of intentional discrimination." *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 929 (7th Cir. 2020) (citation omitted). For example, plaintiffs commonly point to "ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment." *Id.*

Purtue relies on evidence like this and insists that she has enough to get to a jury. The district court concluded otherwise, she says, because it made the mistake of analyzing each piece of evidence in isolation rather than considering her case as a whole. *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) ("Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself ...."). But the district court did not

make that mistake. On the contrary, it surveyed the whole picture and correctly concluded that no reasonable jury could find in Purtue's favor.

We'll start with the incident itself: Purtue contends that the prison's justification for her firing was dishonest. In her telling, the defendants overstated the potential consequences to Reddick from her false report, given that he was likely to be found guilty of a disciplinary violation (albeit a different one) anyway. But Purtue misunderstands the defendants' position. They don't claim to have relied on the punishment Reddick faced at Dodge. Rather, they note that the assault allegation posed especially significant potential consequences to Reddick, including possible criminal prosecution. Most importantly, they highlight that, because Dodge is an intake institution, Reddick's assault of a corrections officer might have led to his assignment to a maximum-security facility. That's a serious consequence, and one more likely to result from an allegation of assault than from an allegation of disruptive behavior. Purtue counters that her report might not have caused Reddick to be sent to such a facility because the higher-ups at Dodge—whom she accuses of being dishonest—would have concluded that the severity of her reported assault did not require such an outcome. Maybe so. But the possibility that Reddick might have escaped the worst outcome does not mean that the defendants lied about the precariousness of the position in which Purtue put him.

In any event, Purtue's culpability, not Reddick's fate, was the stated reason for her dismissal. And Purtue does not deny that she was culpable for this offense. On the contrary, it's undisputed that she made a false report, that making a false report was an offense for which she could be dismissed under

the Department's rules, and that false reports are considered serious because of the potential negative effect on prisoners writ large rather than the consequences in a particular case. Significantly, Purtue does not dispute that a false report could result in a prisoner being sent to a maximum-security facility and that Dodge has an interest in deterring false reports for that reason. So despite Purtue's efforts to show otherwise, this is not a situation in which the punishment was grossly out of proportion to the offense. *Cf. Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285, 290 (7th Cir. 1999) (questioning the sincerity of an employer's stated reason when "the punishment of termination was grossly excessive in light of the alleged infraction of eating a handful of taco chips").

Wall's expert testimony does not undercut this conclusion. Purtue emphasizes his observation that the Department inconsistently made termination decisions, as well as his conclusion that Purtue could not have expected to be fired for her conduct. But even if Wall is right about that, he didn't dispute that filing a false report violated Department rules or that the Department could legitimately consider such a violation to be serious. Though he might have exercised his discretion differently when he was Secretary, his testimony doesn't support an inference that the Department acted so far outside the bounds of normal procedures that its justification for dismissing Purtue was pretextual.

The report showing disparate dismissal rates of female and male employees does not save Purtue's case either. To raise an inference of discrimination, statistical comparators "must be 'directly comparable' to the plaintiff 'in all material respects,'" though "they need not be identical in every conceivable way." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir.

2012) (citation omitted). The statistics on which Purtue relies are unhelpful because they do not reveal *why* any employee in the study was fired—which makes it impossible to determine how many of the fired employees were comparable to Purtue in the respect that matters most. To address this weakness, Purtue identifies particular employees who made false statements but were not fired. Yet she runs into the same problem: she fails to show that the supposed comparators are actually comparable. All but one of the employees that she identifies worked at facilities other than Dodge, so the disciplinary determination fell mostly to different decisionmakers. And while the lone comparator who worked at Dodge was disciplined but not fired for making a "false, inaccurate statement," Purtue concedes that she has no information that would permit her to compare the seriousness of his offense to hers.

In sum, Purtue has not identified evidence tending to indicate that Dodge did anything other than fire her for her admitted violation of Department rules. No reasonable jury could infer that Dodge discriminated against her because of her sex, so the district court was right to enter summary judgment in favor of the defendants. We AFFIRM its judgment.