In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 21-2759

LISA A. NIGRO, M.S., CRNA,

*Plaintiff-Appellant*,

*v.*

INDIANA UNIVERSITY HEALTH CARE ASSOCIATES, INC., D/B/A
INDIANA UNIVERSITY HEALTH PHYSICIANS (IUHP),

*Defendant-Appellee*.

———————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:19-cv-3936 — **Tanya Walton Pratt**, *Chief Judge*.

———————

ARGUED APRIL 7, 2022 — DECIDED JULY 8, 2022

———————

Before RIPPLE and SCUDDER, *Circuit Judges*[*].

SCUDDER, *Circuit Judge*. Lisa Nigro spent less than two
years working in Riley Hospital's Anesthesia Division in In-
dianapolis before being fired for behavioral problems. Nigro

---

[*] Circuit Judge Kanne died on June 16, 2022, and did not participate in
the decision of this case, which is being resolved under 28 U.S.C. § 46(d)
by a quorum of the panel.

brought this lawsuit against the hospital, claiming that her termination was the product of sex discrimination in violation of Title VII of the Civil Rights Act of 1964. Emphasizing the lack of evidence supporting Nigro's claim, the district court entered summary judgment against her. We affirm.

## I

### A

In 2017 Nigro, a certified nurse anesthetist, began working at Riley Hospital for Children, an affiliate of named defendant Indiana University Health Care Associates, Inc. Dr. Senthil Sadhasivam, Division Director for the Anesthesia Division, recruited her to join the department. Around the same time, Dr. Sadhasivam had started developing and implementing a new team-based care model in which certified nurse anesthetists and anesthesiologist assistants worked more closely with anesthesiologists in treating patients.

But the new care model quickly faced criticism. Within a year of its implementation, an internal investigation revealed department-wide concern over the model's efficacy and impact on team dynamics. In addition, some employees—men and women alike—expressed discontent with Dr. Sadhasivam's implementation of the new care model and believed his leadership style resulted in a tense workplace.

In her own role, Nigro added several complications to the Anesthesia Division's aim of creating a collaborative working environment under the new model. Between 2017 and 2019, Nigro was the subject of multiple complaints, mostly concerning her attitude and ability to work on a team. Coworkers described her as "rude, snappy and belittling," with the hospital's management expressing concern that her behavior

undermined the already delicate atmosphere of collegiality within the department.

After investigating the complaints, a group of hospital decisionmakers—Dr. Sadhasivam, Elizabeth Block (chief anesthetist), Melissa Hockaday (chief nursing officer), and Bryan Ooley (department practice administrator)—issued a "coaching memorandum" to Nigro. The memorandum came with no pay cut or loss of responsibilities but identified Nigro's problematic behaviors and explained the hospital's expectations moving forward. The memo also warned Nigro that her behavior negatively affected the workplace and needed to change if she wanted to keep her job.

The final straw came only a month later when Nigro again found herself the subject of more complaints, this time alleging that she had been manipulating the hospital's timekeeping system. In an email to Dr. Sadhasivam, Block, in her role as chief anesthetist, observed that the department had "reached a point where the entire anesthetist team cannot trust Lisa [because] … [s]he is not exhibiting 'team player' characteristics to her colleagues."

After concluding that Nigro had engaged in timekeeping fraud by not working at times when she had been clocked in, four decisionmakers—Dr. Sadhasivam and three female administrators—agreed to terminate her for misconduct and harmful contributions to the workplace environment.

Nigro then commenced this action under Title VII, 42 U.S.C. § 2000e-2(a)(1), and the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq*. She alleged that her termination was the product of sex- and age-based discrimination, not behavioral problems, and that Riley Hospital

retaliated against her because of a supportive affidavit she had signed in another employee's discrimination case. By the time the hospital moved for summary judgment, Nigro abandoned her age discrimination claim, but continued to press her Title VII sex discrimination claim. Throughout the litigation, Nigro has maintained that Dr. Sadhasivam disliked women "because they would stand up to him," and that this hostility was why she ultimately lost her job.

B

The district court immersed itself in the summary judgment record and saw no facts permitting a jury to find sex discrimination or any related retaliation. To the contrary, the district court concluded that the evidence showed only that Nigro's firing was a result of her workplace misconduct, so it entered summary judgment for the defendant.

The district court saw a failure of proof on Nigro's part. In assessing "the singular question" for its consideration—"whether the plaintiff has introduced evidence that would permit a reasonable factfinder to conclude that the plaintiff's … sex … caused the discharge or other adverse employment action"—the court determined that the evidence presented by Nigro fell short. *Igasaki v. Ill. Dep't of Fin. & Prof'l Regul.*, 988 F.3d 948, 957 (7th Cir. 2021) (cleaned up). In its view, Nigro could point to no "better-treated, similarly-situated comparator" and offered no facts refuting the hospital's contention that it fired her "because she continually demonstrated behavior that undermined the collaborative environment."

The district court rejected Nigro's retaliation claim on much the same reasoning. Nigro, the court explained, failed

to identify evidence showing the requisite causal connection between signing the affidavit in the other employee's case and her termination. It therefore entered summary judgment in the hospital's favor.

Nigro now appeals, challenging only the district court's disposing of her Title VII claim.

## II

### A

Under Title VII, an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Having taken our own independent look at the record and drawing all reasonable inferences in Nigro's favor, we agree with the district court that she failed to support the contention that the hospital wrongfully fired her on account of her sex. See *Mahran v. Advocate Christ Med. Ctr.*, 12 F.4th 708, 712 (7th Cir. 2021).

To establish that an employer discriminated in contravention of Title VII, a plaintiff must show that membership in a protected class "caused the discharge or other adverse employment action"—here, Nigro's termination. *Purtue v. Wisc. Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020) (internal quotation omitted). Plaintiffs often will seek to carry their evidentiary burden by using the familiar *McDonnell Douglas* framework. See *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973) (explaining that to prove discrimination under Title VII, a plaintiff must establish a prima facie case by showing she (1) belongs to a protected class, (2) was qualified for the job, (3) suffered an adverse employment action, and (4) was

treated less favorably than similarly-situated employees outside of her protected class, at which point the burden shifts to the employer to show nondiscriminatory reasons for the decision, which the plaintiff can disprove as pretextual). But aligned with our decision in *Ortiz v. Warner Enterprises, Inc.*, we reiterate that what matters most is that Nigro show that she "would have kept h[er] job if [s]he had a different [sex], and everything else had remained the same." 834 F.3d 760, 764 (7th Cir. 2016).

B

The district court was right to see Nigro's claim as suffering from a failure of proof. Analyzed under either *Ortiz*'s more general guidance or the step-by-step *McDonnell Douglas* framework, the question is the same: whether Nigro presented sufficient evidence for a jury to conclude that the hospital fired her on account of her sex. We see no way to answer in her favor. There is neither direct nor indirect evidence to support Nigro's Title VII claim. Indeed, we see not one indication anywhere in the record of sex-based discrimination.

Nigro disagrees and points to two male coworkers—a certified anesthesiologist assistant referred to as CAA#1 and Dr. Morton Green—that she asserts are valid comparators. Both men, she contends, engaged in similar misconduct but did not lose their jobs. The district court was right to conclude that neither CAA#1 nor Dr. Green were fair comparators as neither "engaged in conduct of comparable seriousness." *Reives v. Ill. State Police*, 29 F.4th 887, 892 (7th Cir. 2022); see also *Bless v. Cook County Sheriff's Off.*, 9 F.4th 565, 575 (7th Cir. 2021) ("Although precise equivalence is not required in a comparator, a similarly situated employee must be directly

comparable to plaintiffs in all material respects.") (internal citations and quotation marks omitted).

As Nigro recognizes, CAA#1 struggled with substance abuse and was the center of one unsubstantiated complaint alleging that he was not "appropriately alert" in an operating room. And as for Nigro's second comparator, Dr. Green displayed some level of insubordination by expressing resistance to new protocols the department put in place in 2019. But neither CAA#1 nor Dr. Green received several grievances for a lack of professionalism or an inability to work well with others. Nigro did. This difference matters and shows that CAA#1 and Dr. Green are not valid comparators.

The district court saw the facts the same way and properly focused on the dissimilar behavior exhibited by Nigro and her comparators. Nigro offered no evidence of a comparator who engaged in similar conduct—she needed to point to someone who likewise received repeated complaints for inattentiveness, unprofessionalism, and belligerence at a time when the department sought to increase teamwork and collegiality. Without doing so, she had no way to "isolate the critical independent variable—discriminatory animus." *Formella v. Brennan*, 817 F.3d 503, 512 (7th Cir. 2016) (internal quotation marks omitted); see also *Abrego v. Wilkie*, 907 F.3d 1004, 1013–14 (7th Cir. 2018) (determining that coworkers without similar, repeated behavioral issues were not similarly situated for purposes of a Title VII claim).

As part of trying to prove her Title VII claim, Nigro also points to the complaints made against Dr. Sadhasivam as evidence of what she sees as his dislike for and mistreatment of women. To be sure, Dr. Sadhasivam was not without his share of criticism—several individuals complained that he was

frequently antagonistic toward women in particular. But after interviewing all employees in the department as part of investigating allegations of sexism, Terri Christopher, Manager of Human Resources, concluded that all employees—"young, old, men, women"—felt Dr. Sadhasivam treated them unfavorably. In the end, Nigro's generalized accusations of sex-based hostility by Dr. Sadhasivam are insufficient to get her to trial.

The district court recognized other factors that cut against Nigro's sex discrimination claim. Remember, for instance, that it was Dr. Sadhasivam who recruited Nigro to work at Riley Hospital. See *Blasdel v. Northwestern Univ.*, 687 F.3d 813, 820 (7th Cir. 2012) (explaining that, while not determinative, evidence that a defendant took part in hiring the plaintiff can undermine a Title VII claim). Moreover, Nigro offers no evidence to suggest that the three women who took part in the decision to fire her did not base their determination on an independent assessment of her misbehavior in the workplace and were, instead, influenced by animus harbored by Dr. Sadhasivam. See *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 886 (7th Cir. 2016).

At bottom, the record shows that Nigro experienced challenges working with others and that those challenges led to and explain her eventual termination. Like the district court, we see no evidence in the summary judgment record permitting a jury to reach a contrary conclusion. So we are left to AFFIRM.