NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued May 25, 2022
Decided July 29, 2022

**Before**

KENNETH F. RIPPLE, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

CANDACE JACKSON-AKIWUMI, *Circuit Judge*

No. 21-1168

| | |
|---|---|
| KENDALYNN JACKSON,<br>*Plaintiff-Appellant*, | Appeal from the United States District Court<br>for the Central District of Illinois. |
| *v.* | No. 3:17-cv-03106-RM-TSH |
| ILLINOIS DEPARTMENT OF<br>COMMERCE AND ECONOMIC<br>OPPORTUNITY, *et al.*,<br>*Defendants-Appellees.* | Richard Mills,<br>*Judge.* |

**O R D E R**

This is a section 1983 case in which a state employee charges her two former supervisors with race and sex discrimination in violation of the Fourteenth Amendment's Equal Protection Clause based on a negative performance evaluation and an unpaid, seven-day suspension. 42 U.S.C. § 1983. The district court granted summary judgment in favor of the defendants. We affirm.

## I.

Plaintiff Kendalynn Jackson worked for the Illinois Department of Commerce and Economic Opportunity ("DCEO" or "the Department") as a tax incentive program manager in the Office of Business Development from September 2014 to May 2017, when she made a lateral move to the Illinois Department of Transportation. During her tenure at the DCEO, she was supervised by Deputy Director Victor Narusis from May 2015 to August 2016 and by Assistant Deputy Director Ben Denney from August 2016 until her departure for the Department of Transportation. Jackson is Black and female; Narusis and Denney are both male. Jackson has named both Narusis and Denney as defendants, alleging that they are responsible for the discriminatory employment actions of which she complains. *See Doyle v. Camelot Care Ctrs., Inc.*, 305 F.3d 603, 614 (7th Cir. 2002) ("It is well-established that a plaintiff only may bring a § 1983 claim against those individuals personally responsible for the constitutional deprivation.").

Although her predecessor at DCEO had enjoyed the support of a full-time employee to assist him, that employee was transferred to another group not long after Jackson joined the Department, and thereafter Jackson was instead supported by a succession of no less than 18 temporary employees and interns. The defendants attribute the lack of a permanent, full-time assistant to a hiring freeze; Jackson cites it as the first of many aspects of a discriminatory campaign to isolate her and make it difficult for her to do her job.

In September 2016, Narusis, who had become Jackson's supervisor when he joined the Department in May 2015, completed a series of long-overdue performance evaluations of Jackson covering her first year of employment with DCEO: an initial probationary evaluation for the period beginning on September 16, 2014, and ending on November 15, 2014 (her first 60 days); a final probationary evaluation for the period beginning on September 16, 2014, and ending on December 31, 2014; and a regular evaluation for the full year beginning on September 16, 2014, and ending on August 31, 2015. Each rated her performance as "met" or "acceptable" as to all performance objectives. (In consultation with human resources personnel, Narusis gave satisfactory ratings to all employees under his supervision in their evaluations for this time period due in part to the delinquency of all such evaluations and in part due to the fact that Narusis did not join the department until after the time period relevant to these evaluations had concluded.) The third evaluation also included performance objectives for the subsequent work year ending in August 2016, which of course by September 2016 had already concluded.

Then, one month later, in October 2016, Narusis completed Jackson's annual evaluation for the year ending August 31, 2016, rating her performance as unacceptable with respect to a number of the performance objectives included in the 2015 evaluation issued the prior month. Jackson objected to the negative ratings on the basis *inter alia* that the pertinent objectives had only been identified one month earlier (after the 2016 work year had already ended), although Narusis represented that the objectives were consistent with Jackson's job description and had otherwise been communicated to her previously. Narusis also cited emails and examples of Jackson's work in support of the negative ratings. Jackson offers a number of criticisms of the evaluation process, including the fact that she was not permitted to adequately respond to the allegedly false appraisal of her work performance.

Apart from the disputed performance evaluation, Jackson subsequently was given a seven-day unpaid suspension effective November 17, 2016, based on two incidents relating to her conduct with an agency outsider and with Denney, who by this time had succeeded Narusis as her supervisor.

The first incident involved an October 2016 phone call with Mark Rothart, an enterprise zone administrator (in effect, a DCEO stakeholder or customer). The allegation was that Jackson yelled at Rothart and was otherwise rude, unprofessional, and abusive with him during the call. Denney, by his account, ultimately stepped in and took over the call. Jackson admitted that she had raised her voice at one point during the call—she contends that Rothart was shouting at her and was abusive with her—but denies that she herself was rude, unprofessional, or abusive with him.

The second incident involved Jackson's reaction to General Counsel Justin Heather's decision to edit and then issue, under Jackson's name, an internal memo she had written regarding a 2017 enterprise zone for Bloomington-Normal, Illinois. Heather corrected a portion of the memo to reflect recent developments regarding a legal issue and otherwise made some editorial and stylistic changes to the memo before forwarding it to the Department Director for approval. Jackson did not dispute that Heather properly reviewed her memo as he did with other, similar memoranda, but she objected to the fact that it was issued under her name as revised without her first having seen the updated version. She confronted Denney over the matter, and Denney alleged that Jackson was agitated, aggressive, yelling, uncooperative, and unprofessional during the multiple conversations she had with him about the revised memo. Jackson disputes that she behaved as Denney alleged.

Jackson continued working for the DCEO until May 2017, when she accepted a new position with the Department of Transportation, where she earned the same rate of pay as she had at DCEO.

Prior to accepting her new position, Jackson filed suit against Denney, Narusis, and DCEO, contending that Denney and Narusis had discriminated against her based on her race and gender in violation of her rights under the Equal Protection Clause of the Fourteenth Amendment and that all three defendants took retaliatory action against her in violation of the Illinois State Officials and Employees Ethics Act, 5 ILCS 430/15-10. The district court dismissed the state claim as to all three defendants based on Eleventh Amendment and statutory sovereign immunity (R. 16), leaving only the equal protection claims against Denney and Narusis.

In response to the individual defendants' subsequent motion for summary judgment, Jackson cited the negative evaluation in 2016 (premised on performance objectives that had only been articulated after the fact in the prior evaluation for 2015) and the seven-day suspension as adverse employment actions that she attributed to her gender and race. (She also had alleged a hostile work environment in her complaint, but she did not discuss this in opposing summary judgment and any such claim was deemed abandoned.)

The district court agreed with Jackson that the three 2014-15 evaluations were late and that the last of those evaluations included performance objectives that would have been impossible for her to meet for 2016 because they were communicated to her after the fact. However, the court, consistent with Seventh Circuit precedent, held that negative evaluations in and of themselves did not constitute adverse employment actions. R. 30 at 17; *see de la Rama v. Ill. Dep't of Human Servs.*, 541 F.3d 681, 686 (7th Cir. 2008) (collecting cases).

As to the suspension, although Jackson disputed the way in which her conduct had been characterized, the court reasoned that her allegations did not call into question the honesty of the defendants' perception that she had behaved in the way they said she had behaved. In other words, there was nothing to suggest that either Denney or Narusis did not sincerely believe that Jackson was agitated and had behaved unprofessionally. R. 30 at 18–19. Finally, the court did not see any evidence in the record supporting the notion that Jackson's race or gender played a role in Jackson's suspension. R. 30 at 19. "There is no evidence that Defendants lied about the reason for the suspension. The explanation offered for the suspension was consistent. At most, the Parties had different interpretations of the same events." R. 30 at 19. With the federal claims disposed of, the district court relinquished supplemental jurisdiction over the

state claim (which the court had previously resolved against Jackson on immunity grounds) and dismissed that claim without prejudice. R. 30 at 21.

**II.**

We review the district court's decision to enter summary judgment in the defendants' favor de novo. *E.g.*, *Gaddis v. DeMattei*, 30 F.4th 625, 630 (7th Cir. 2022). We take the evidence and all reasonable inferences that may be drawn therefrom in the plaintiff's favor. *Eaton v. J.H. Findorff & Son, Inc.*, 1 F.4th 508, 511 (7th Cir. 2021). We do not "assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence." *Driveline Sys., LLC v. Arctic Cat, Inc.*, 936 F.3d 576, 579 (7th Cir. 2019) (quoting *Stokes v. Bd. of Educ. of City of Chi.*, 599 F.3d 617, 619 (7th Cir. 2010)).

As we noted at the outset, Jackson contends that her former state supervisors subjected her to multiple discriminatory actions based on her race and gender, in violation of the Fourteenth Amendment's Equal Protection Clause. An employment-related equal protection claim of this nature is evaluated using the same standards we apply to Title VII claims. *Purtue v. Wis. Dep't of Corr.*, 963 F.3d 598, 601 (7th Cir. 2020) (Barrett, J.) (citing *de Lima Silva v. Dep't of Corr.*, 917 F.3d 546, 559 (7th Cir. 2019)). Jackson is not relying on the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973), to make her case of discrimination. Instead, she is making a case based on the whole of the evidence she has assembled that the defendants took discriminatory action against her based on her race and gender. *See Reives v. Ill. State Police*, 29 F.4th 887, 892 (7th Cir. 2022); *Chatman v. Bd. of Educ. of City of Chi.*, 5 F.4th 738, 746 (7th Cir. 2021); *Purtue*, 963 F.3d at 601–02; *Khowaja v. Sessions*, 893 F.3d 1010, 1014 (7th Cir. 2018); *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018); *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Her case need not satisfy any formula or rest upon any particular type of evidence in order to survive the defendants' motion for summary judgment. *See Purtue*, 963 F.3d at 602 (citing *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 929 (7th Cir. 2020)). So long as the factfinder could reasonably conclude from the totality of the evidence presented that Jackson's race and/or sex was the cause of the employment decisions of which she complains, the case must proceed to trial. *See id.* (citing *Johnson*, 893 F.3d at 894).

One necessary element of Jackson's discrimination claim is an adverse employment action. *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 635 (7th Cir. 2013). An adverse employment action typically involves a material change in the terms or conditions of employment. *See Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 744–45

(7th Cir. 2002) (listing examples). As noted, the district court agreed with Jackson that her seven-day unpaid suspension constituted an adverse employment action, *see Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 647 (7th Cir. 2005) ("[A] suspension without pay … would constitute an adverse employment action") (citing *Markel v. Bd. of Regents of Univ. of Wis. Sys.*, 276 F.3d 906, 911 (7th Cir. 2002)), but the court held that the negative job evaluation for 2016 by itself did not constitute such an action. Jackson argues the latter holding was incorrect, given that the negative performance assessments had a direct bearing on her eligibility for promotion as a matter of Illinois statute. *See* 20 ILCS 415/8b.2 & 8b.14 (outlining "promotion" and "performance records"); *People ex rel. Mathes v. Foster*, 353 N.E.2d 366, 370 (Ill. App. Ct. 1976), *j. aff'd*, 367 N.E.2d 1320 (Ill. 1977). Yet, even if we give Jackson the benefit of any doubt on this point, *but see Pierri v. Medline Indus., Inc.*, 970 F.3d 803, 808 (7th Cir. 2020) ("[A] hypothetical loss of potential future bonuses does not constitute an adverse employment action."), the defendants were nonetheless entitled to summary judgment on another ground.

Jackson must show that the defendants took these adverse employment actions against her because of her race and gender. *See Igasaki v. Ill. Dep't of Fin. & Prof. Reg.*, 988 F.3d 948, 95859 (7th Cir. 2021); *Khowaja*, 893 F.3d at 1014, 1016; *Johnson*, 892 F.3d at 894; *Hedrich v. Bd. of Regents of Univ. of Wis. Sys.*, 274 F.3d 1174, 1183 (7th Cir. 2001); *Nabozny v. Podlesny*, 92 F.3d 446, 453–54 (7th Cir. 1996); *Huebschen v. Dep't of Health & Social Servs.*, 716 F.2d 1167, 1171 (7th Cir. 1983), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S. Ct. 2061 (2002). Her brief in this respect largely focuses on her unpaid suspension, and what she maintains is the pretextual nature of the defendants' stated reasons imposing that suspension on her. The suspension was, according to the defendants, premised on the two instances of unprofessional conduct we have described: she allegedly yelled at and was discourteous with agency stakeholder Mark Rothart in the phone call that Denney ultimately took over, and she was likewise agitated, yelling, and unprofessional when she discussed with Denney the modifications that Heather had made to her memo. Apart from Rothart, Jackson and Denney are the only two people with personal knowledge of the two encounters and how Jackson comported herself in those encounters. They gave directly contradictory accounts in that respect, with Jackson insisting that she was not rude, agitated, shouting, or otherwise unprofessional in either instance. As we noted earlier, the district court accepted as true Jackson's averment that she remained professional at all times but deemed this insufficient to call into question the honesty of Denney's *belief* that she had behaved as he had described or Narusis's

decision to credit Denney's account when he imposed the suspension on Jackson. R. 30 at 19.

We take the district court's point that there is a distinction between the accuracy of an employer's stated reasons for taking disciplinary action against an employee and the honesty of the employer's articulation of those reasons, *e.g.*, *Liu v. Cook Cnty.*, 817 F.3d 307, 316 (7th Cir. 2016), but for present purposes we can assume *arguendo* that Jackson's account establishes a dispute of fact as to both grounds for the suspension. That is, we can assume that if a jury, after hearing the conflicting accounts from these two witnesses at trial, believed Jackson's testimony that she behaved in a measured and professional matter in dealing with Rothart and Denney, it could also infer that Denney could not honestly have perceived her conduct as unprofessional.

Of course, it was Narusis, according to the defendants, who made the decision to suspend Jackson, and Jackson faces a steeper obstacle in her effort to show that even if Denney gave a dishonest account of her interactions with Rothart and himself, Narusis himself did not honestly believe Denney's version of events and acted accordingly when he decided to discipline Jackson. Indeed, apart from Denney's account, there was an email from Rothart addressing his telephone call with Jackson and there were two employees who witnessed Jackson's interactions with Denney regarding the memorandum revised by Heather and backed up his account. But we may set that point aside.

Jackson's rationale as to her negative 2016 performance evaluation and whether the criticisms of her performance in that evaluation were pretextual is essentially the same as it is with respect to the suspension: that the stated criticisms of her performance were dishonest. The district court itself agreed that the goals articulated for the 2016 evaluation were late (in that they had only been articulated in the 2015 evaluation issued one month earlier) and that Jackson could not have been expected to meet them. As with the suspension, we may again assume, without deciding, that a jury could find the criticisms set forth in the 2016 evaluation were pretextual.

Pretext is certainly one circumstance that can help to show unlawful employment discrimination, *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147, 120 S. Ct. 2097, 2108 (2000); *O'Neal v. City of New Albany*, 293 F.3d 998, 1005 (7th Cir. 2002) (quoting *Perdomo v. Browner*, 67 F.3d 140, 145 (7th Cir. 1995)), but the question in this case is whether the dishonesty of the employer's explanation is a cover for gender and/or race discrimination or something else, *see King v. Ford Motor Co.*, 872 F.3d 833, 842 (7th Cir. 2017) (plaintiff must show not just that employer's rationale for adverse

employment action was pretextual, but that it was a pretext for forbidden discrimination) (collecting cases). We can readily assume, in view of the evidence Jackson has marshaled, that she was a disfavored employee and that her superiors wanted to penalize her and ultimately get rid of her. That evidence includes, *inter alia*, an excessive workload, the lack of a full-time support person, the negative 2016 performance evaluation based on after-the-fact objectives, her supervisor's alleged failure to follow state policies and procedures with respect to her performance appraisals, the purportedly dishonest reasons for her suspension, and also a directive that she not talk to other persons outside or inside the agency.[1] But the question, again, is whether the hostility to Jackson was motivated by her race and/or her gender, or some other characteristic. She might have been disfavored for political reasons, personality reasons, or for some other reason altogether independent of her race or gender.

Recall that Jackson is not relying on the *McDonnell Douglas* framework, which *inter alia* would have required proof that she was treated less favorably than another employee of a different race or gender in order to establish a *prima facie* case of discrimination. *See, e.g.*, *Reives v. Ill. State Police*, *supra*, 29 F.4th at 892. Had Jackson made such a showing, it might have been possible for the factfinder to draw the inference that the defendants were motivated by her race and/or her gender in subjecting her to adverse treatment. But Jackson has identified no such comparator in her brief.[2] So she must point to some other circumstance that implicates her race or gender as the source of the animus against her. *Cf. Reives*, 530 U.S. at 143–45, 151–52, 120 S. Ct. at 2106–07, 2010–11 (plaintiff in age discrimination action, apart from showing that employer's explanation for firing him was false, cited evidence that company director commented negatively on his age, swore at and scolded him as if he were a child, and treated otherwise similarly-situated, younger worker more favorably).

---

[1] The defendants assert that it was necessary to restrict Jackson's communications with individuals inside and outside of the Department because of complaints that she was difficult to deal with.

[2] We note that Jackson's affidavit did identify a white co-worker who "yelled loudly" at her regarding the office microwave oven but who was not disciplined for her behavior after Jackson expressed concern about the incident to Narusis. R. 27-1 at 5 ¶ 34. Jackson has not cited or relied on this incident in her brief, so we need not address it.

We pause here to acknowledge the possibility that the defendants' very perceptions, however genuine, that Jackson had comported herself in an unprofessional manner in the two incidents giving rise to her suspension may have been the product of sexist and/or racist stereotypes. After all, it is not unusual for women, particularly women of color, who speak up for themselves in the workplace to be perceived as loud, rude, aggressive, or even hysterical when in fact their manner of speaking and comportment is no different from that of their white male counterparts. *See Brooks v. Avancez*, — F.4th —, 2022 WL 2447111, at * 7 (7th Cir. July 6, 2022); Daphna Motro, *et al.*, *The "Angry Black Woman" Stereotype at Work*, HARVARD BUS. REV. (Jan. 31, 2022), https://hbr.org/2022/01/the-angry-black-woman-stereotype-at-work; Ruchika Tulshyan, *Speaking Up As A Woman Of Color At Work*, FORBES (Feb. 10, 2015), https://www.forbes.com/sites/ruchikatulshyan/2015/02/10/speaking-up-as-a-woman-of-color- at-work/; Kieran Snyder, *The abrasiveness trap: High-achieving men and women are described differently in reviews*, FORTUNE (Aug. 26, 2014), https://fortune.com/2014/08/26/ performance-review-gender-bias/ (all visited July 25, 2022). Had the reports and criticisms of Jackson's behavior been framed in overtly racial or sexual terms, or had there been additional surrounding circumstances affirmatively suggesting that the defendants' perceptions of Jackson were influenced by racial or sexual stereotypes, it might be possible for the factfinder to infer a causal link between the two. *Cf. Price Waterhouse v. Hopkins*, 490 U.S. 228, 235–36, 255–56, 109 S. Ct. 1775, 1782–83, 1793–94 (1989) (comments on female manager's candidacy for partnership to effect that she was "macho," "overcompensated for being a woman," used profanity, needed "a course at charm school," and, in order to improve her prospects for promotion, ought to "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry," suggested that sex stereotyping influenced firm's decision to place her candidacy on hold), *superseded by statute in other respects*, 42 U.S.C. §§ 2000e–2(m), 2000e–5(g)(2)(B). But this is not a line of argument that Jackson herself has pursued, and she has not undertaken to make such a showing.

Apart from pretext, Jackson points only to two circumstances that, in her view, connect her race and gender to the adverse employment actions of which she complains. First, in February 2016, when she went to discuss a work matter with Denney, he reacted to her in such a way that she perceived him to be treating her as if she were a dog. In her words, "Ben was sitting in his chair, he started laughing at me, and commanded me to 'COME HERE,' then pointed downwards, as if calling a dog to sit or someone to kneel." R. 27-3 at 10. Second, more than once, Denney referred to her as a "girl" in the office. R. 20-1 at 5–6, Jackson Dep. at 19–20.

Taken together with the other facts, these circumstances are not sufficient to establish a nexus between Jackson's race or gender and the adverse employment actions at issue. The relevance of the "come here" incident depends largely on Jackson's subjective perception that Denney was treating her like a dog. To be sure, the behavior that Jackson describes is odd, even boorish, but on its face and without additional context, such rude and/or boorish behavior is not enough to show forbidden discrimination. *See Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675, 678 (7th Cir. 2005); *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 809 (7th Cir. 2001); *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1140 (7th Cir. 1997), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S. Ct. 2061 (2002). The "girl" remarks are potentially more relevant on their face, but here the problem is the lack of additional detail as to when, how often, and in what context Denney referred to Jackson as a "girl." Beyond characterizing the references as derogatory, Jackson shed almost no light on these remarks in her deposition. She said that Denney used the term more than once, but beyond that she could not recall the details. (For his part, Denney represents that he once addressed a group of employees, including Jackson, as "boys and girls.") Without more information about these references, we have no way of knowing whether these were isolated, stray remarks, or whether they occurred frequently enough and/or in a context that would suggest a race and/or gender bias.

Without any evidence of a causal nexus between Jackson's race and gender and the adverse employment actions she has identified, no factfinder could find in her favor on her Fourteenth Amendment equal protection claims, and the defendants were entitled to summary judgment.

## III.

For the reasons discussed, the district court properly entered summary judgment against Jackson and in favor of the defendants and relinquished jurisdiction over the state-law claim.

AFFIRMED